# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1998-DP-01038-SCT

*CHARLES WAYNE ROSS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/04/1997 |
| TRIAL JUDGE: | HON. R. KENNETH COLEMAN |
| COURT FROM WHICH APPEALED: | TIPPAH COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF CAPITAL DEFENSE COUNSEL |
| | BY: ALISON R. STEINER |
| | ANDRE DE GRUY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | REVERSED AND REMANDED - 04/26/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Charles Wayne Ross was convicted of the capital murder of Hershel Ray Yancey by the Circuit Court of Tippah County and sentenced to death. Finding errors in both the guilt and sentencing phases of the trial, we reverse and remand for a new trial.

**FACTS**

¶2.    The victim, Hershell Ray Yancey, was a construction worker who lived in rural Tippah County.  On Friday, June 28, 1996, he was dropped off at his residence by a co-worker between 7:00 p.m. and 7:10 p.m.

¶3.    Between 7:00 and 9:30 that night, a nearby neighbor, Linda Grey, noticed a loud vehicle driving up and down the road outside her home.  Between 9:30 and 10:00, what sounded to her like the same vehicle turned into her yard, approximately 100 to 150 feet from her house.  Grey walked outside to investigate and saw a dark-colored car whose make and model she could not specify.  She saw a short person working under the hood of the vehicle, and, as the car drove away, she noticed that the right tail light was broken.  Grey testified that the car drove away in the direction of Yancey's residence, and that she believed the car stopped near the residence and left its engine running.[1]

¶4.    Yancey's mother, Marie Yancey, lived in a trailer across the road from him.  That night, she had prepared dinner for her son and asked him to wait at her residence until she returned.  Yancey was not there when she returned home around 9:10 p.m., but she saw that he had eaten dinner and left the lights on.  Yancey's mother also noticed that all of the lights in Yancey's residence were on, but there were no vehicles in the driveway.  She assumed Yancey had gone home to take a shower and did not go to his residence to check on him.

¶5.    Shortly after 9:10 p.m., Yancey's mother heard a loud vehicle coming down the road going south and passing both houses.  It was too dark for Yancey's mother to determine

---

[1]Grey's daughter testified that she saw a green, early-seventies model Chevrolet truck parked in front of Yancey's residence between 9:30 p.m. and 10:00 p.m.  No one from the Sheriff's Department contacted Grey's daughter for any follow-up investigation about what she had seen.

whether the vehicle was a car or a truck or how many people were in it. At 9:28 p.m., she heard what sounded like the same vehicle start up at Yancey's residence. She then went to her kitchen window, and saw a vehicle drive away towards Dumas. She did not hear the car's engine between 9:10 and 9:28 p.m. Neither Yancey's mother nor any other witness remembered hearing any gunshots or any other loud noises that might have masked the sound of gunshots. Marie Yancey found her son's body in his residence the next morning after he failed to come over for breakfast.

¶6. An autopsy showed that Yancey had been fatally shot four times with a .22 caliber weapon. The initial investigation conducted by the Tippah County Sheriff's Office determined that Yancey's wallet, television, and VCR were missing and that there were no signs of a forced entry or struggle. The deputies found an uncashed payroll check for $438.64 in the residence. They also collected beer cans, a broken electrical cord, and shards of red plastic consistent with an automobile's tail lights from Yancey's residence.

¶7. Though not brought out at trial, the investigation initially determined that on the afternoon of June 28, an individual identifying himself as Charles Ross [hereinafter "Ross"] had called a local store asking for Yancey and had left the phone number of a rented trailer occupied by Tommy Hale, Hale's girlfriend Margaret Jones, and Jones' son, Jerry Sanders. Ross and Jones are half-siblings. Ross' and Jones' nephew, Donald Ross, Jr., stayed at the Hale residence on occasion and was a close companion of Sanders.

¶8. Based on the phone call reported by the store owner, the sheriff's office contacted the Hale household on Saturday, June 29. Hale and Jones initially denied having seen Ross. On Sunday, June 30, Donald Ross, Jr.'s mother contacted the sheriff's office and said that her

3

son was willing to come to the police station and give a statement. Donald Ross, Jr. made his statement to the deputies, in which he averred that Ross had arrived at Hale's residence on the evening of June 29 with a television, VCR, wallet, and gun, and that he had admitted to murdering Yancey. When Donald Ross, Jr. made his statement, he did not claim to have personally seen Ross or to have heard the purported confession. At trial, he admitted that he had not witnessed Ross' arrival nor had he heard his uncle admit to the murder, but that he had been told by his Aunt Margaret that Ross had done so.

¶9. On the evening of Sunday, June 30, the sheriff's deputies came to the Hale residence to investigate. They took Jones and Hale into separate rooms to take their statements. At that time, Jones first stated that Ross had told her that he killed Yancey and stole Yancey's television, VCR, and wallet. Jones said that she saw Ross toss a pistol over his head into a sewage ditch behind the Hale residence and burn Yancey's wallet on an outdoor grill belonging to Hale.

¶10. Deputies found the television and VCR in Sanders' bedroom. They found the gun in the sewage ditch sixty-five feet from where Jones told the officers Ross had tossed it over his head. Deputies discovered an empty holster in Donald Ross, Jr.'s Bronco, but did not search the vehicle for ammunition or other evidence. Jones and Hale testified that Hale's son found the holster for Hale's gun behind the commode in their trailer three weeks later. Hale said he called the sheriff's office and told them they discovered the actual holster, but no one from the sheriff's office came out to examine it.

¶11. The deputies also found a pile of ashes on the grill outside the Hale residence. One of the investigators, Deputy Wayne Wilbanks, testified at trial that he believed that the ashes

4

were the byproduct of a wallet which had been burned with the assistance of an accelerant. The State did not conduct any forensic tests on the ashes to determine their composition. The photograph of the grill and ashes included in the record indicate that whatever was burned in the grill had completely disintegrated.

¶12. Ross drove a black, 1984 Ford Cougar which had a missing right tail light and ran loudly as a result of a missing muffler and a rattling motor. On Tuesday, July 2, officers found and confiscated Ross' vehicle, which was parked on the property of Ross' brother, Donald Ross, Sr. Inside the vehicle, deputies found seven empty Budweiser cans and one full Budweiser can, three of which matched the manufacturer's stamp of the beer cans in Yancey's trailer. About a quarter of a mile from the car, officers discovered Ross in the woods with bed clothes, cigarettes, food, rubbing alcohol, a thermos, and $50 to $60.

¶13. The only latent fingerprints the officers found at the murder scene were on the door of Yancey's trailer. Those prints did not match Ross' fingerprints, and the sheriff's office did not compare the prints to those of Jones, Hale, Sanders, or Donald Ross, Jr. When asked why he did not compare the fingerprints on the door to those of the other potential suspects, Deputy Wilbanks said he was under the impression that defense counsel "was going to take care of that." With regard to the reasoning behind the decision not to investigate the other occupants of the Hale residence, then-Sheriff Gary Mauney explained, "there was no reason to suspect any of them because to our knowledge and all, they were assisting us." Deputy Wilbanks also testified that the police did not test for gunshot residue on the hands of anyone who had stayed at the Hale residence that night, including Ross, even though such a test might have shown whether anyone had fired a gun recently.

¶14.    The witnesses' account of the events in the evening on June 28 differ substantially. Jones testified that on the afternoon of June 28, Ross came to visit her at the trailer where she lived with her boyfriend, Hale. She stated that Ross left in his black, 1984 Ford Cougar between 8:30 or 9:00 p.m. and returned around 11:30 p.m. Jones' testimony at trial conflicts with her second recorded statement to Ross' investigator regarding the incident, in which she stated that Ross came home between 8:30 and 9:00 that evening.[2] Her testimony also conflicts with that of Hale, who testified that Ross left the trailer around 8:00 p.m. and returned sometime between 9:00 and 10:00 p.m. When asked if Ross might have returned as late as 11:30 p.m., Hale insisted that Ross had returned earlier.

¶15.    Jones testified that when Ross returned, only she and Hale were home. She stated that Sanders and Donald Ross, Jr. did not come home until just before 12:00 p.m. Hale testified that Sanders and Donald Ross, Jr. returned before Ross, and that all were present when Ross arrived with the television and VCR. At trial, Jones testified that Ross took her into a bedroom and showed her a three-fold wallet. This conflicts with her statement to Ross' investigator, in which she stated that Ross had shown her the wallet outside the trailer. Both stories conflict with Hale's testimony, in which he said he never saw Jones and Ross go outside or into a bedroom alone. Inside the wallet, Jones said she saw a $5 bill and an identification of some sort. She also said she was able to read the name, "Ray Yancey" on the identification. Jones testified she did not know whether the wallet was made of leather or plastic.

---

[2]The statement was taken by Herbert Wells, who was offered as an investigator and an expert on police procedures. Ross proffered the statement into evidence, but the trial court excluded it.

6

¶16. Jones testified that Ross then brought in a television and a VCR, one of which was missing part of its cord. When she asked where he got the items, Ross told her it was best that she not know. Jones stated that around 12:30 or 1:00 a.m., Ross told her he wanted to talk to her outside. According to Jones, the following conversation ensued:

> He told me, he said, "I went over there;" and said, "I shot that son of a bitch one time right here;" [indicating between the eyes] and he said, "[Yancey] looked at me and asked me, 'What did you do that for Charles Ross?' and he said it didn't bother him; and he said, 'I just kept shooting and shooting.'. . . Oh, he asked me . . . 'Do you not believe that I shot somebody?' I said, 'I don't know,' . . . and he said he had a gun. He said, 'Do you not believe that I've got a gun?' I said, 'I don't know.' He reached down under. He got in his car and reached down under his seat, and pulled a gun out. She [sic] showed me a gun, you know, held the gun up. . . . He was standing with [his] back to the car, and give [sic] the gun a little flip [indicating he tossed it over his head backwards], throwed [sic] it out down the hill. . . .

She testified that Ross then took some paper out of his car, placed it on the charcoal grill, laid the wallet on top of it, and used the paper to burn the wallet. In her statement to Wells, Jones said Ross took the papers out of the wallet and used them to start the fire. She also stated that Ross used no accelerant when burning the wallet. This statement conflicted with the opinion of Deputy Wilbanks, who testified that an accelerant would have to be used to reduce a wallet to ashes.

¶17. Jones stated that after their conversation, Ross went to sleep on the couch. She woke Donald Ross, Jr. some time after midnight to tell him what Ross had said. Donald Ross, Jr. gave inconsistent accounts of the night, first testifying that he was asleep when Jones came to speak to him, but later admitted on cross-examination that he and Sanders drove Ross' car sometime after midnight the night of Yancey's murder.

7

¶18.    Jones testified that she then woke Hale and told him about her conversation with Ross. She stated that her conversation with Hale occurred between 12:30 and 1:00 a.m. Hale testified that the conversation took place between 11:00 and 11:30 p.m. Jones said she asked Hale if he knew where his .22 caliber pistol was. She testified he then checked the top drawer where he kept it and discovered that the pistol and its holster were missing. When asked where her son and Donald Ross, Jr. had been that night and what vehicle they were in, Jones replied that, although she could not be certain, they were supposed to have been visiting Sanders' girlfriend's house in Donald Ross, Jr.'s Bronco. Hale also testified he could not be certain what vehicle Sanders and Donald Ross, Jr. were driving that night.

¶19.    On Saturday morning, Jones, Sanders, and Hale went to visit Jones' and Ross' mother. Jones and Sanders testified they told her mother Ross had confessed to murdering Yancey and that her mother cried in response to the news. However, Hale testified when they visited Jones' mother, Jones "never said nothing [sic]" to her mother about the murder. Instead, he says they only told her his gun was missing.

¶20.    Ross' version of the events of that night differs substantially from the accounts of Jones, Sanders, Hale, and Donald Ross, Jr. At the time of the incident, Ross was unemployed and had no place to live. He testified that sometimes he stayed with Donald Ross, Sr., his brother, and about two or three nights a week he stayed with Hale and Jones. According to Ross, he became good friends with Yancey when they were coworkers. He said he had been out to Yancey's trailer two or three times, and at least one of those times Donald Ross, Jr. had been with him. This conflicts with Donald Ross, Jr.'s testimony, in which he said that he did not know Yancey and did not know where he lived.

8

¶21. Around 1:00 p.m. on the day of the murder, Ross went to a bootlegger and purchased beer. During the afternoon, Ross drank the beer he purchased and visited various friends and family. He said he intended to spend the night at Donald Ross, Sr.'s trailer, but discovered upon his arrival that the trailer was locked and no one was home. He testified that he then went to Hale's trailer to see if he could spend the night there, arriving around 5:30 or 6:00 p.m. Ross maintained that he left the Hale residence around 7:00 p.m. and returned to Donald Ross, Sr.'s trailer to see if anyone had come home and unlocked the house. He testified that, finding the trailer was still locked, he decided to go back to the Hale residence and sleep on Hale's couch, and arrived at the residence between 8:30 and 9:00 p.m.

¶22. Ross estimated that, by the time he reached the Hale residence, he had consumed three six-packs of beer. He testified he did not leave the trailer after that, and the last thing he remembers before going to sleep was asking Jones to wake him at 7:00 the next morning. He testified that he did not see the television or VCR before going to sleep. Ross stated that he woke up and saw Sanders and Donald Ross, Jr. trying to hook up a television and VCR. He said he got up, went out to his car to get another beer, took a drink, put it on the coffee table, and went back to sleep.

¶23. He testified Jones woke him up the next morning an hour later than he had asked. He said he knew nothing of Yancey's death at that time and never talked to Jones about it.

## DISCUSSION

¶24. On appeal, Ross raises fifteen assignments of error, which we have consolidated into twelve: (I) that the jury selection process in his trial was fatally flawed; (II) that the trial court made several errors in ruling on the admissibility of evidence at trial; (III) that the State

9

engaged in prosecutorial misconduct; (IV) that the assistance of counsel during the trial was ineffective; (V) that the competency hearing ordered by this Court was deficient; (VI) that his sentence violates the United States Supreme Court ruling in *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002); (VII) that the trial court erred in granting the State's jury instructions and in denying his proposed instructions; (VIII) that the trial court impermissibly restricted his right to present mitigation evidence; (IX) that the indictment against him was fatally flawed in several respects; (X) that the death penalty is unconstitutional as applied to him; (XI) that his conviction was against the overwhelming weight of the evidence; and (XII) that the cumulative errors in his trial require reversal. Where the death penalty has been imposed, the standard of review is heightened:

> We reaffirm at the outset our commitment to heightened scrutiny on appeal in cases where the sentence of death has been imposed . . . The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity. This theme, the unique nature of the death penalty, has been repeated time and time again. This Court has repeatedly recognized that appellate review in capital cases is different from that in other cases.

*Neal v. State*, 451 So. 2d 743, 750 (Miss. 1984) (internal citations & quotations omitted). This Court also stated in *Neal* "that thoroughness and intensity of review are heightened in cases where the death penalty has been imposed. What may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Id.* at 749 (quoting *Irving v. State*, 361 So. 2d 1360, 1363 (Miss. 1970) (citing *Laney v. State*, 421 So. 2d 1216, 1217 (Miss. 1982) and *Williams v. State*, 445 So. 2d 798, 810-11 (Miss. 1984)). Guided by this heightened standard of review, we turn to Ross' assignments of error.

10

## I.    JURY SELECTION PROCESS[3]

### A.    Tainted Venire Panel.

¶25.    During voir dire, when the trial court asked if anyone knew Ross, venire member Wanda Martindale stood and said, "I've testified against him in federal court," and that this fact would prejudice her against Ross. Defense counsel did not request a recess to address Martindale's statement or have her removed from the panel. Later, when the court asked if any venire member had been a victim of a crime, Martindale indicated that she had. The trial judge noted that she had already admitted her bias, and that he understood the reason for that bias. During defense counsel's challenges for cause, the following exchange occurred:

> BY THE COURT: We might as well get rid of [juror number sixty-seven] right now.
>
> BY MR. KITCHENS [DEFENSE COUNSEL]: I was wondering about the comment she made, how beneficial that was to the whole panel when she stood up and said she had testified against our client in federal court.
>
> BY THE COURT: I heard her say she testified against him.
>
> BY MR. KITCHENS: She specifically didn't mention that in her jury questionnaire.
>
> BY MR. HOOD: We challenge [juror number seventy-two]. She said she did not believe in the death penalty.

Defense counsel neither expressly objected to the juror's comment, nor did he request an instruction to disregard from the trial court. Martindale was subsequently removed from the

---

[3]This opinion does not address Ross' claim that the State impermissibly excluded African-American venire members from the jury in violation of the United States Supreme Court's mandate in ***Baston v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) and ***Powers v. Ohio***, 499 U.S. 400; 111 S. Ct. 1364; 113 L. Ed. 2d 411 (1991).

venire and did not serve on Ross' jury. In a post-trial Motion for Judgment Notwithstanding the Verdict or in the Alternative for a New Trial, Ross argued that the trial court erred in failing to quash the entire jury venire.

¶26. The State contends that Ross is procedurally barred from bringing this claim because he did not object to the testimony or request an instruction. Ross argues that defense counsel's statements constituted an objection and, in the alternative, that a defendant who fails to make a contemporaneous objection may still preserve the issue for appeal by raising it in a motion for a new trial. *Ahmad v. State*, 603 So. 2d 843, 846-47 (Miss. 1992).

¶27. The rule that failure to make a contemporaneous objection waives the issue on appeal generally applies to death penalty cases. *Williams v. State*, 684 So. 2d 1179, 1189 (Miss. 1996). An objection must be made with specificity, and failure to articulate the grounds for objection constitutes a waiver of the alleged error. *See*, *e.g.*, *Latiker v. State*, 918 So. 2d 68, 74 (Miss. 2005) (failure to state a legal basis for objection waives right to appeal alleged error); *Irby v. State*, 893 So. 2d 1042, 1047 (Miss. 2004) (general objection that jury instruction is "prejudicial," without more, is insufficient to preserve for appeal); *Crawford v. State*, 787 So. 2d 1236, 1246 (Miss. 2001) (general objection that expert witness was "mistaken" insufficient to preserve issue for appeal).

¶28. Defense counsel's general statement that he "wondered" about "how beneficial" the statements were, without more, was not a specific enough objection to preserve the issue for appeal. Defense counsel did not cite any legal principle, did not request a ruling from the trial judge, and did not object when the prosecution moved on to the next venire member.

¶29.   The question remains whether Ross may preserve his right of appeal by raising an objection in a motion for new trial.  Ross cites **Ahmad v. State**, which states "if an appellant raises for review an issue not raised in the pleadings, transcript, or rulings, the appellant must have preserved the issue by raising it in a motion for new trial."  **Ahmad,** 603 So. 2d at 846-47.  However, the principle in **Ahmad** and virtually all comparable cases concerns the failure to include in a post-trial motion matters objected to during the trial.  *See  Id.* at 846-47 (failure to raise contemporaneous objection and failure to include references in motion for a new trial waive error on appeal).  *See also* **Townsend v. State**, 939 So. 2d 796 (Miss. 2006) (failure to move to dismiss indictment during trial and failure to raise issue in motion for J.N.O.V. waives the issue on appeal); **Shavers v. State**, 455 So. 2d 1299, 1302 (Miss. 1984) (failure to raise contemporaneous objection waives issue on appeal).  The only other case we have found in which an otherwise untimely error was found to be preserved solely through a motion for a new trial was **Hodges v. State**, 912 So. 2d 730, 751 (Miss. 2005).  In **Hodges**, this Court expressly found that the defendant was not procedurally barred from challenging the prosecution's closing argument despite the failure to raise a contemporaneous objection.  *Id*.  The Court went on to consider the merits of Hodges' claim and denied relief.  *Id*. at 751-55.

¶30.   However, this Court has more often held that "while certain issues are required to be raised in a motion for new trial, raising objections in a motion for new trial which should have been made at trial has never been thought to cure the failure to object at the proper time."  **Smith v. State**, 797 So. 2d 854, 856 (Miss. 2001) (citing **Barnett v. State**, 725 So. 2d 797, 801 (Miss. 1998)).  *See also* **Pinkney v. State**, 538 So. 2d 329, 346 (Miss. 1988),

13

*vacated on other grounds by* 494 U.S. 1075, 110 S. Ct. 1800, 108 L. Ed. 2d 931 (1990) (noting that issue raised for first time in motion for new trial was procedurally barred); *Anderson v. Jaeger*, 317 So. 2d 902, 907 (Miss. 1975) (same). *Smith* and its progeny articulate the more appropriate rule. In *Hodges*, notwithstanding the procedural bar, this Court addressed the merits of the issue in order to dismiss the claim. Because Ross' counsel failed to object to Martindale's statement and failed to seek a curative instruction, we will not address the issue unless the trial court committed plain error.

¶31.    In general, a voir dire is presumed sufficient to ensure a fair and impartial jury. To overcome this presumption, a party must present evidence indicating that the jury was not fair and impartial and show that prejudice resulted from the circuit court's handling of the voir dire. *Manning v. State*, 735 So. 2d 323, 336 (Miss. 1999). A trial court's finding that an impartial jury was impaneled will not be reversed unless the court abused its discretion. *Holland v. State*, 705 So. 2d 307, 336 (Miss. 1997). This Court will treat with deference a venire person's assertions of impartiality. *Id.* (citing *Scott v. Ball*, 595 So. 2d 848, 850 (Miss. 1992)).

¶32.    This Court has held that a defendant fails to show the necessary prejudice where the defense counsel fails to question jurors about an inappropriate comment, and the venire members have made general declarations that they could set aside their prejudices and reach a decision based on the evidence. *Holland v. State*, 705 So. 2d 307, 339-40 (Miss. 1997); *West v. State*, 463 So. 2d 1048, 1054 (Miss. 1985). If venire members are questioned about an impermissible comment, the trial court may strike those who heard the comment. *Baldwin v. State*, 732 So. 2d 236, 241-42 (Miss. 1999).

14

¶33.   Ross correctly notes that it is the obligation of the trial court to insure that the jury impaneled in a case can render an impartial judgment. ***Puckett v. State***, 737 So. 2d 322, 332 (Miss. 1999).  That obligation goes to the core of a defendant's right to a fair jury trial under the Sixth and Fourteenth Amendments of the United States Constitution.  Evidence of Ross' prior criminal convictions would not have been admissible during the culpability phase of the trial unless it had fallen within one of the exceptions to the prohibition on evidence of "prior bad acts" or had been used to impeach his credibility.  *See* M.R.E. 404(b) & 609.  However, this Court has no basis on which to determine the potential prejudice caused by Martindale's statements, because the defense counsel failed to object to the comment and subsequently failed to question potential jurors about the effect of the statement.  While Martindale's statements are cause for great concern, we will not find prejudice absent a record.  Whether defense counsel's failure to remove Martindale from the panel after her first statement and its failure to query venire members about possible prejudice caused by her statements constituted ineffective assistance of counsel will be considered in Section IV.

   **B.      Questioning of Prospective Jurors**.

¶34.   Ross argues that the trial court impermissibly restricted his right to question potential jurors on their ability to consider mitigating evidence during the sentencing phase of the trial. The State's challenge to defense counsel's questions came at the beginning of the defense's voir dire questioning regarding the death penalty:

   Q:      [By defense counsel Kitchens] Mr. Green, are you pro-death as in
            morally you believe it, or in sitting around the coffee shop is that
            something that sounds like a good idea?

A:    [Mr. Donnie Green] I would say I'm for the death penalty if the facts in the case merit the death penalty according to law.

Q:    That's a good starting point for where I want to go.  What facts and circumstances in your mind would merit the death penalty?

(Mr. Hood [District Attorney] stood)

BY THE COURT:   Sustained.

BY MR. HOOD:     Your Honor, I object.

BY THE COURT:   I sustained the objection.  That's not a proper question.

Q:    Would there be anything that could be presented that would convince you that the death penalty is not necessary?

A:    Sure.

BY MR. HOOD:     Objection, Your Honor

BY THE COURT:    I sustain the objection.  Those are not proper questions to ask the jury on voir dire.  You know that, Mr. Kitchens.  Go ahead.

Q:    Then I have no further questions of you, sir.  All right, on the second row, ma'am.

During the defense's voir dire, defense counsel asked the following questions without objection:

"[A]re you saying that you can't listen to the evidence presented and return a fair verdict either way because of your belief in the death penalty?"

"Are you telling me that under no set of circumstances could you return a non-death penalty verdict?"

"Are you saying if you did find him guilty, no matter what amount of testimony was put on, that once you found him guilty, you would also vote that he needs to die for his involvement?"

"Now, we will present mitigating circumstances.  I will compare that to a ball, not a base hit or a home run, but probably a ball.  You know in baseball if you

16

get four balls, you walk. Unfortunately, it's not like that in this. I can't provide you with four mitigating circumstances and he doesn't get the death penalty, but those are good things about him. Those are things that—well, I said good things; but those are things about him that on your conscience of what you heard might warrant you in saving his life; that might make you think, well, what he did was wrong; and he should be punished for it but not with his life."

"Is there anybody in here who could not sit in this courtroom in this jury box and listen to mitigating circumstances, who could not under any circumstances if a guilty conviction were reached, could not listen to anything that was good about him that should or could save his life?"

¶35.    Mississippi law guarantees the right of either party in a case to probe the prejudices of prospective jurors and investigate their thoughts on matters directly related to the issues to be tried. *West v. State*, 553 So. 2d 8, 22 (Miss. 1989). Such questions enable parties to conscientiously challenge prospective jurors for cause and provide valuable clues for the exercise of peremptory challenges. *Harris v. State*, 532 So. 2d 602, 606 (Miss. 1988). However, judicial rules prohibit a party from asking venire members hypothetical questions or attempting to elicit a pledge to vote a certain way if a certain set of circumstances are shown.[4] Questions seeking a commitment from jurors are never necessary to accomplish the basic purpose of securing fair and impartial juries. *Harris*, 532 So. 2d at 607. Because the line between a proper and an improper question is not always easily drawn, it is manifestly a process in which the trial judge must be given considerable discretion. *Id* at 606 (citing

---

[4]"In the voir dire examination of jurors, the attorney will question the entire venire only on matters not inquired into by the court. Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court. No hypothetical questions requiring any juror to pledge a particular verdict will be asked. Attorneys will not offer an opinion on the law. The court may set a reasonable time limit for voir dire." U.R.C.C.C. 3.05.

*Murphy v. State*, 246 So. 2d 920, 921 (Miss. 1971)). An abuse of that discretion will only be found where the defendant shows clear prejudice resulting from undue lack of constraint on the prosecution or undue constraint on the defense. *Evans v. State*, 725 So. 2d 613, 650 (Miss. 1997).

¶36. The trial court's ruling in the present case was within its discretion. Asking jurors to speculate on what sorts of events or circumstances might warrant mitigation may in some circumstances be considered hypothetical. A review of case law demonstrates that circuit courts are permitted to take a variable approach to the use of specific circumstances, irrespective of whether they are hypothetical or actual facts in the case. *See*, *e.g.*, *Crawford v. State*, 716 So. 2d 1028, 1042-43 (Miss. 1998) (superceded on other grounds, *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31 (Miss. 2003)) (finding that defense counsel's use of specific hypothetical facts about the defendant did not violate U.R.C.C.C. 3.05); *Evans v. State*, 725 So. 2d 613, 651 (Miss. 1997) (trial judge prohibited as hypothetical a voir dire question asking whether an underlying crime of kidnapping or sexual battery would justify the imposition of the death penalty); *Davis v. State*, 684 So. 2d 643, 651 (Miss. 1996) (finding that prosecution's voir dire was within the permissible range of acceptable questioning, where the prosecution asked about specific facts, including that the victim was killed by a friend, that the defendant had no prior felony convictions, and that defendant was charged with one murder); *Stringer v. State*, 500 So. 2d 928, 938 (Miss. 1986) (finding that prosecution's specific questions about the facts of the alleged crime, asked during voir dire and alluded to as an oath in closing argument, had the cumulative effect of denying defendant the right to a fair trial). The trial court acted within its discretion in ruling

18

that defense counsel's attempt to elicit statements from venire members regarding specific circumstances warranting the imposition of the death penalty violated the prohibition on hypothetical questions.

¶37. Ross also failed to show that the trial court's ruling on the challenged voir dire questions prevented defense counsel from probing prospective jurors' ability to consider mitigation evidence. The record demonstrates that defense counsel asked a number of questions pertaining to mitigation evidence. The assignment of error is without merit.

C. **Trial Court's Refusal to Instruct the Venire Panel that Consideration of Possible Sentences Was Not Indicative of Ross' Guilt**.

¶38. Ross contends that the trial court committed reversible error in refusing to give a special instruction to the venire members that questions regarding the application of the death penalty did not pertain to Ross' guilt or innocence. In his brief, Ross concedes that there is no constitutional right to such an instruction for potential jurors, but argues that where there is a genuine danger that a jury will convict based on something other than lawful evidence proved beyond a reasonable doubt, such an instruction is required by the United States Supreme Court. *See Delo v. Lashley*, 507 U.S. 272, 278, 113 S. Ct. 1222, 1225, 122 L. Ed. 2d 620, 628 (1993).

¶39. Ross has not shown that any such genuine danger existed in the present case. While the trial court refused to give the proposed instruction, it made repeated reference to Ross' presumption of innocence and the burden that the State had to carry in order to move on to the punishment phase of the trial. Defense counsel was in no way restricted from noting Ross' presumption of innocence, and in fact emphasized it in his voir dire. Nothing in the

19

record suggests that any party conflated consideration of the death penalty with an assumption of guilt, or that venire members misunderstood the significance of considering possible sentences during voir dire. This assignment of error is without merit.

## II.    EVIDENTIARY CHALLENGES

### A.    Admission of Hale's .22 Caliber Pistol.

¶40.    A .22 caliber pistol was found in a ditch behind Hale's residence. It was later determined to belong to Hale. The State introduced the pistol as the murder weapon. Ross argues that the trial court erred in refusing to hear his pre-trial motion to suppress the pistol and erred in eventually admitting the firearm into evidence in violation of M.R.E. 403. The State argues that the trial court was under no obligation to hear the motion before trial, that Ross has failed to preserve the issue for appeal because defense counsel failed to object to the admission of the firearm during trial, and that, in any event, its admission was permissible under M.R.E. 403. Defense counsel first raised the issue of its pre-trial motion to suppress in the midst of jury selection, during a brief break during which the court asked to hear certain pre-trial motions outside the presence of the venire members:

> BY THE COURT: What else do we have? We'll put that one on the back burner.
>
> ARGUMENT BY MR. KITCHENS:
>
> Your Honor, in this case we filed a motion to suppress. That would be the alleged murder weapon in this case. The ballistics report from the State Crime Lab in our discovery came back that the weapon was not, it was inconclusive as far as ballistics and as far as fingerprints. There were no fingerprints of the defendant found to be on the weapon.
>
> We would have issue with that being introduced into evidence since it cannot be conclusively identified as the murder weapon. We feel like if it

20

were allowed to be introduced, all it would do is confuse the jury as to the fact that they might think that that is, in fact, the murder weapon; however, that cannot be conclusively determined; therefore, I think it would not be relevant evidence. It would be more prejudicial than it would be probative.

BY THE COURT: We'll take this up when we get to it. When did you file this motion?

BY MR. KITCHENS: I filed it, it's been on file.

BY THE COURT: That's what I'm saying. These motions haven't been called up. I was up here all last week, sat here and asked, specifically asked are there motions to be heard; and there wasn't [sic] any motion to be heard. Now, I'm not going to try this case like being nibbled to death by a duck. We're going to do it all at one time or at the proper time; and as these motions come up, if you think it's an evidentiary objection, well, we'll take it up at the time. If we have to send the jury out, we'll send them out; but we just don't have time now. I'm not going to take time with the jury standing out in the hall. The motion has been filed and hasn't been called up.

Ross did not raise the issue of the motion to suppress again before the trial began. During the trial, defense counsel failed to make any objection whatsoever, and the trial court permitted its admission.

1.    *Ross' pre-trial motion to suppress the pistol.*

¶41.   Under Rule 2.04 of the Uniform Rules of Circuit and County Court Practice, the burden is on the movant to obtain a ruling on a pre-trial motion, and failure to do so constitutes a procedural bar.[5] *See **Berry v. State***, 728 So. 2d 568, 570 (Miss. 1999) ("It is the responsibility of the movant to obtain a ruling from the court on motions filed by him and failure to do so constitutes a waiver of same."); ***Holly v. State***, 671 So. 2d 32, 37 (Miss.

---

[5]"It is the duty of the movant, when a motion . . . is filed . . . to pursue said motion to hearing and decision by the court. Failure to pursue a pretrial motion to hearing and decision before trial is deemed an abandonment of that motion; however, said motion may be heard after the commencement of trial in the discretion of the court." U.R.C.C.C. 2.04.

21

1996) (finding that the burden to obtain a ruling on an in limine motion to exclude evidence rests on the moving party); *Martin v. State*, 354 So. 2d 1114, 1119 (Miss. 1978) (same). The orderly administration of justice dictates that the trial judge be vested with a considerable amount of discretion with respect to trial calendaring and docket management, and we will not overturn a trial court's decision absent an abuse of discretion. *Palmer v. State*, 427 So. 2d 111, 114 (Miss. 1983).

¶42.    Ross' failure to obtain a ruling on his pre-trial motion was a direct result of his failure to request a ruling at an appropriate time. The trial court expressly noted that it had provided a time to hear pre-trial motions and that conducting an evidentiary hearing on the pistol was inconvenient since the venire members had been convened and were waiting outside the courtroom. Further, the trial court did not deny the motion to suppress, but instead reserved judgment until the State moved to introduce the weapon into evidence. Therefore, the trial judge did not err in declining to rule on Ross' pre-trial motion.

> 2.    *The admission of the pistol at trial.*

¶43.    Ross next argues that, because he initially raised his motion to suppress before trial, the trial court denied his motion *sub silento* by admitting the pistol into evidence without conducting a hearing, and the issue is consequently preserved for appeal. As noted above, it is incumbent upon the movant to obtain a ruling on a proffered motion. *Berry*, 728 So. 2d at 570. Failure to do so constitutes a waiver. *Id*. Notwithstanding this procedural bar, we will consider the merits of Ross' claim under the plain error doctrine in light of the gravity of the charge. *Walker v. State*, 913 So. 2d 198, 216 (Miss. 2005) .

¶44.    The admissibility of evidence rests within the discretion of the trial court, and reversal

22

is appropriate only when a trial court commits an abuse of discretion resulting in prejudice to the accused. *Irby v. State*, 893 So. 2d 1042, 1047 (Miss. 2004) (citing *Sturdivant v. State*, 745 So. 2d 240, 243 (Miss. 1999)). Relevance is a threshold requirement of admissibility. M.R.E. 402; *Foster v. State*, 508 So. 2d 1111, 1117 (Miss. 1987). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." M.R.E. 401. Rule 401 is construed broadly in favor of admitting evidence with even slight probative value. *See* M.R.E. 401 cmt. However, even otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M.R.E. 403. Under Rule 403, the exclusion of prejudicial evidence is permissive; that is, if a trial court determines that the prejudicial effect of evidence substantially outweighs its probative value, it is not obligated to exclude the evidence, but may do so at its discretion. *See Foster*, 508 So. 2d at 1117.

¶45. Ross cites *Foster v. State* for the proposition that evidence must be excluded where it is not tied to the alleged crime by any forensic evidence and its introduction is more prejudicial than probative to the defendant. *Foster v. State*, 508 So. 2d 1111, 1117 (Miss. 1987), *overruled on other grounds*, *Powell v. State*, 806 So. 2d 1069 (Miss. 2001). However, *Foster* stands for a more circumscribed principle: where there is no forensic evidence tying a weapon to a murder or other violent crime, witnesses cannot testify that the weapon "could be" the one used in the crime. Instead, witnesses are restricted to stating that forensic evidence showed that the weapon in evidence was "consistent" with the type used in the

23

crime or that the weapon cannot be excluded as the weapon used in the crime. *See Foster*, 508 So. 2d at 1117; *Kolberg v. State*, 829 So. 2d 29, 72 (Miss. 2002) (affirming this reading of *Foster*). In the present case, the forensic scientist called by the State did not state that the .22 caliber pistol introduced into evidence could have been the weapon used in Yancey's murder; he was careful to note only that the weapon had the same caliber, and that both the weapon in evidence and the murder weapon lacked distinguishing characteristics that would allow a positive identification. Therefore, the State's witness did not impermissibly speculate whether Hale's pistol had been used in the crime.

¶46.    We have held that trial courts should not exclude conceivably prejudicial evidence solely because forensic testing cannot tie it to the crime. When there is evidence that a weapon could have caused an injury and some connection between the defendant and the weapon exists, the weapon will be deemed relevant and admissible. *See Rhodes v. State*, 676 So. 2d 275, 283 (Miss. 1996) (citing *Ethridge v. State*, 418 So. 2d 798 (Miss. 1982) and *Stokes v. State*, 518 So. 2d 1221 (Miss. 1998)). Here, while the pistol was not directly connected to Ross through any forensic evidence, other evidence in the case demonstrated that the pistol was of the same caliber as the one that killed Yancey and that Ross had access to the weapon. Further, Jones testified that Ross disposed of the pistol after admitting to Yancey's murder. Under the circumstances, the trial court did not abuse its discretion in admitting the pistol into evidence. This assignment of error is without merit.

**B.    Trial Court's Refusal to Admit the State's Ballistics Report**.

¶47.    Ross argues the trial court erred in refusing to admit the ballistics report of the State's expert into evidence. Ross initially moved to have the ballistics report submitted into

evidence during the State's case:

> BY MR. PANNELL: Your Honor, we would ask that that report be admitted into evidence.
>
> BY THE COURT: Any objection?
>
> BY MR. HOOD: Yes, sir, your Honor. We object. His testimony, it hasn't been substantially impeached. There isn't a need to introduce the lab report.
>
> BY THE COURT: What do you want to introduce it for?
>
> BY MR. PANNELL: Because I want to refer to it in my closing argument. I want them to have it there where they can read it.
>
> BY THE COURT: You can have it marked for identification if you want[.]

Ross renewed his motion to admit the ballistics report during his own case, moving to admit the report either to impeach the State's witnesses or to refresh their recollections under M.R.E. 803 and 804.

¶48.    The admissibility of evidence rests within the discretion of the trial court, and reversal is appropriate only when a trial court commits an abuse of discretion resulting in prejudice to the accused. *Irby*, 893 So. 2d at 1047. Evidence may be excluded under M.R.E. 403 if it is merely cumulative. Ross correctly notes that the ballistics report was absolutely admissible as a public record under M.R.E. 803(8), and that it did have to be introduced as a prior statement under M.R.E. 801. The trial court did not specify the grounds for excluding the report. Given the gravity of the charge and the slender basis for connecting Ross to the pistol, it is difficult for us to say the trial court was correct in excluding the report. However, we decline to reverse on these grounds, since Ross was able to extensively cross-examine the State's ballistics expert and highlight the minimal value of the evidence provided by the

25

report. The effect of this ruling on our confidence in the outcome of the trial will be addressed in Section XII.

### C. Admission of Glass Shards and Fragments of Burnt Material.

¶49. Ross contends that the trial court erred in admitting glass shards consistent with a motor vehicle's tail light found at Yancey's residence and a pile of ashes that Jones testified were the remains of Yancey's wallet. The relevance of the tail light fragments was tenuous at best. While Ross' car had a broken right tail light, all the testimony at trial indicated that it had been broken for at least six months. There was even testimony that the broken tail light had been spray-painted to disguise the fact that it was broken. Linda Grey testified that the car she saw in her driveway already had a broken tail light. It is undisputed this episode happened prior to the murder. Finally, the State's forensic expert testified that he could not make the tail light fragments fit mechanically into what remained of Ross' tail light. Despite the complete lack of direct evidence connecting the fragments to Ross' car, the State argued that Ross had broken out the tail light after he stumbled with Yancey's television. The relevancy of the ashes taken from Hale's grill presents similar problems. Jones testified that Ross had burned a wallet, using, depending on which story, either papers taken from the wallet or papers removed from his car. The ashes then sat on the grill from Friday night until Sunday night, when the sheriff's deputies collected them. At trial, the State made no showing that the ashes had been covered or that they had remained undisturbed for that forty-eight hour span. Most troubling, the State conducted no forensic tests on the ashes to determine their composition, yet at trial asserted that they were the remains of a wallet.

¶50. At trial, Ross not only failed to object to the introduction of these items, but

affirmatively stated for the record that there was no objection. Such action effectively waives the issue on appeal. *Ballenger v. State*, 667 So. 2d 1242, 1267 (Miss. 1995). Though Ross did challenge the admission of these items in his motion for a new trial, a belated challenge to an evidentiary ruling does not rehabilitate an otherwise untimely claim. *Smith*, 797 So. 2d at 856. Nevertheless, the heightened scrutiny applicable to the review of death penalty cases mandates a review of the merits of Ross' claim. *Walker*, 913 So. 2d at 216 (relaxing the contemporaneous objection rule in death penalty cases).

¶51.   As noted above, the admission of evidence is within the discretion of the trial court, and courts have been instructed to construe the Mississippi Rules of Evidence in favor of admission. *See Irby*, 893 So. 2d at 1047; M.R.E. 401 cmt. Though the tail light fragments may have been of slight probative value, Ross had ample opportunity to highlight that the state's own expert could not mechanically fit the fragments into the tail light frame. Similarly, Ross was able to challenge the probative weight of the ashes by emphasizing that no forensic tests had been conducted to determine the composition of the burnt material. The trial court did not abuse its discretion in admitting the evidence. *Irby*, 893 So. 2d at 1047. Nor does the admission of the evidence amount to plain error, since the admission, by itself, did not constitute a miscarriage of justice. *Gray*, 549 So. 2d at 1321.

> **D.    Whether the Beer Cans Seized by Police From Ross' Car Were Taken in Violation of the Fourth Amendment.**

¶52.   The police began searching for Ross after officers took statements from Hale and Jones on June 30. On July 1, they went to the residence of Ross' brother, Don Ross, Sr., and noted a vehicle in the yard matching the description of Ross' car. The police radioed in the

tag number and were told that tag on the car had been switched. Officer Wilbanks testified that, when the police asked to search the premises, Don Ross, Sr. replied that he did not care if the police searched. The police noted that the vehicle had a broken tail light and that there were several beer cans, similar to those found at the crime scene, on the floorboard, and had the car towed to the sheriff's office. A warrant for Ross' arrest had not yet been issued, and the police did not obtain a search warrant for either the car or Don Ross, Sr.'s residence. The trial court conducted a hearing on the admissibility of the beer cans and found that, because the car's tag had been switched, the car was in plain view, and the officers had consent to search the premises, there was no constitutional violation.

¶53. On appeal, Ross argues that the trial court committed reversible error in admitting the beer cans into evidence since the car was searched without a warrant in violation of the Fourth Amendment. Ross contends that the search does not fall under the "automobile exception" to the Fourth Amendment because the car was not searched incident to a lawful arrest. He further contends that the car could not be searched under the "plain view" exception to the Fourth Amendment because the car was on private property and was not visible from a public road. The State responds that Don Ross, Sr. gave his consent for officers to search the premises and, implicitly, that Don Ross, Sr. had authority over the premises to permit the search.

¶54. Though we normally will defer to a trial court's determination on the admissibility of evidence absent an abuse of discretion, we review de novo a trial court's interpretation of law. *Harris v. State*, 757 So. 2d 195, 197 (Miss. 2000). Consent to search is recognized as an exception to the requirements of a warrant and probable cause. *United States v. Matlock*,

28

415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974); *Hudson v. State*, 475 So. 2d 156, 158-59 (Miss. 1985). Consent to search may be provided by a third party who possesses common authority over or other sufficient relationship to the premises or effects sought to be inspected. *Id*. at 158. A renter such as Don Ross, Sr. has been recognized as possessing sufficient authority to consent to a search of the premises. *Id*. Ross had no ownership interest in the premises and therefore cannot argue that any expectation of privacy was violated. *Compare Scott v. State*, 266 So. 2d 567, 569 (Miss. 1972) ("[W]here the proof shows that a person is renting a room or is in possession of a room in a house or an apartment under such circumstances as to make such person the owner thereof for the time being, such person is entitled to the protection afforded by Section 23 of the Constitution."). Because Don Ross, Sr. consented to a search of his premises, evidence collected pursuant to that consent was constitutionally acquired. This assignment of error is without merit.

### E. Exclusion of Expert Testimony of Herbert Wells.

¶55. Ross contends that the trial court erred in excluding the testimony and accompanying investigative report of his expert in investigatory techniques, Herbert Wells. Wells' proffered testimony purported to show the inadequacy of the police investigation, the impossibility of burning a wallet until only ashes remained, and the contradictions between Jones' statement to him and her testimony at trial. The State argued that the proffer was untimely, and that the testimony should be excluded as a violation of the discovery rule. The trial court heard the proposed testimony outside the presence of the jury and ruled it inadmissible. Though not entirely clear, the trial court appears to have ruled the testimony inadmissible as a substantive matter and not because it was untimely.

¶56. A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. *Walker v. State*, 878 So. 2d 913, 915 (Miss. 2004). However, this discretion must be exercised within the confines of the Mississippi Rules of Evidence. *Cox v. State*, 849 So. 2d 1257, 1268 (Miss. 2003); M.R.E. 103(a). Reversal is proper only where such discretion has been abused and a substantial right of a party has been affected. *Id*. The trial court's discretion must also insure the constitutional right of the accused to present a full defense in his or her case. *United States v. Stewart*, 323 104 F.3d 1377, 1384 (D.C. Cir. 1997).

¶57. The admissibility of expert testimony is evaluated in light of M.R.E. 702, which holds that such testimony may be introduced when it is found to be relevant and reliable. *See Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 38 (Miss. 2003); *see also* M.R.E. 702. Testimony is relevant if it will assist the trier of fact in understanding or determining a fact at issue. *Id.* To meet the requirement of reliability, an expert's testimony must be based on the methods and procedures of science, and not merely on subjective beliefs or unsupported speculation. *Id.*, at 36 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)). Rule 702 expressly allows expert testimony regarding non-scientific matters, so long as the witness's knowledge, skill, experience, training, or education qualify him as an expert in a given field, and (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.

¶58. In his proffered testimony, Wells questioned Jones' account of Ross destroying Yancey's wallet by burning it. Wells stated that he had attempted to destroy a wallet by

setting it on fire with a great deal of paper underneath. After the attempt proved unsuccessful, he gave the wallet time to cool off and saturated it with lighter fluid. That attempt also proved unsuccessful, and he brought the remains of the wallet with him as part of his proffered testimony. The State objected that Wells had not been proffered as an expert in incineration. The trial court excluded this testimony upon finding that, without any evidence offered as to the type of wallet Yancey owned, the accuracy of the demonstration could not be substantiated.

¶59. Rule 401 of the Mississippi Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Wells' experiment was inadmissible under Rule 401 since he could not verify that the wallet he burned was similar in composition to Yancey's or that he had attempted to destroy it under similar circumstances. The trial court did not abuse its discretion in excluding Wells' testimony regarding the experiment.

¶60. Wells also offered testimony in which he highlighted the statements Margaret Jones made to him in a personal interview, which were inconsistent with her initial statement to police as well as her testimony at trial. In particular, he discussed the fact that she told him Ross arrived at Hale's residence between 8:30 and 9:00 p.m, while she testified at trial that he arrived around 11:30 p.m. However, introduction of any such statements would have been mere commentary on the veracity of a witness, which is not appropriate expert testimony under Rule 702. *Smith v. State*, 925 So. 2d 825, 833 (Miss. 2006). The trial court therefore

31

did not err in refusing to allow Wells to comment on Jones' testimony at trial.

¶61. Finally, Wells was proffered as an expert on police investigatory techniques. He testified to his experience in securing crime scenes and collecting evidence, and opined that in those areas the investigation into Yancey's murder was deficient. However, his proffer failed to establish the reliability of his testimony under *Daubert* and *McLemore*. Consequently, the trial court did not err in excluding it.

      **F.**     **Exclusion of Prior Inconsistent Statement of Margaret Jones**.

¶62. Ross maintains that the trial court refused to allow him to impeach Jones with prior inconsistent statements made in her statement to Wells and that it erred in refusing to admit the statement into evidence. The record demonstrates that defense counsel laid the proper foundation for the introduction of impeachment evidence:

> BY MR. PANNELL: So that wouldn't come as any surprise to you, that I would have both a tape and a transcript of what you said at that time [in a September 10, 1997, statement made to defense investigator Herbert Wells]?

> BY MR. HOOD: Your Honor, we haven't been provided with anything like that in discovery.

> BY THE COURT: All right, go ahead. If the discovery issue comes up, I'll rule on it at the proper time.

The trial court allowed defense counsel to use the contents of Jones' statement to Wells to probe inconsistencies between her testimony at trial, her initial statement to police, and her statement to Wells. The State subsequently objected to defense counsel testifying:

> BY MR. PANNELL: You said that you saw [Yancey's wallet] on the inside

32

[of Hale's residence] today. You said back on July 1 [, 1996,] [in your first recorded statement] that you saw it on the outside. You said when you talked to Mr. Wells on the 10th of September [1997,] that you saw it on the outside.

BY MR. HOOD: Objection, you Honor. I object, number one, to him testifying and making any statement about a transcript.

BY THE COURT: I sustain that objection. Limit it to cross-examination.

After the State completed its redirect examination of Jones, defense counsel moved to have her second recorded statement, made to Hebert Wells, introduced into evidence:

BY MR. PANNELL: Your Honor, we move to have her voluntary statement [made to Herbert Wells] into evidence [sic]. I believe there are contradicting statements in there.

BY THE COURT: You can have it marked for identification if you want to, if you want to do that for the record.

. . . .

BY MR. HOOD: If Tom wants to move it in, we may not have an objection.

BY A JUROR: Can the jurors look at identification?

BY THE COURT: Items of evidence that are marked for identification, the Court has not ruled on its admissibility yet. It's just marked for identification, all right.

BY MR. HOOD: Your Honor, we don't have any objection to it being introduced into evidence.

BY THE COURT: Let it be marked as received as an exhibit to the testimony of that witness.

[DEFENDANT'S EXHIBIT 1 WAS MARKED AS RECEIVED.]

Despite the State's willingness to have the statement admitted into evidence, the record demonstrates that it was only marked for identification at that time. The trial court did not elaborate on its grounds for reserving its ruling. After the testimony of Deputy Wilbanks and outside the presence of the jury, defense counsel argued that Wells' statement fell under an exception to the discovery rule, and therefore should have been admitted:

> BY MR. PANNELL: Yesterday we were prevented from reading from the statement that we took from Margaret Ann Jones on the grounds we had not provided it to [the State] in discovery. We took a second look at this discovery rule, and Rule 904(c)(1), (2), or (3) does not require us to provide them with impeached material nor work product, both of which this is.

> BY THE COURT: I've forgotten what it was you objected to.

> BY MR. PANNELL: They objected to me reading from this statement and contradictory statements that Margaret Ann Graves Jones had given on the grounds it had not been discovered to them. This is work product and is also for impeachment, and the rule does not require us to provide that to them.

> BY MR. LUTHER: As I recall, he was granted --

> BY THE COURT: I sustained that objection on a completely different ground as I recall. Do you plan on calling a witness back or something?

> BY MR. PANNELL: No, but I want to get this –

> BY THE COURT: You can mark it for identification if you want to.

> [DEFENDANT'S EXHIBIT 4 WAS MARKED FOR IDENTIFICATION.]

> BY MR. HOOD: Your Honor, we still, just for the record, have not been

34

provided with that copy of that.

BY THE COURT: It's up here if y'all want to look at it. It's been marked for identification.

Though it is unclear, the objection the trial court sustained was presumably the State's objection to defense counsel testifying. The trial court neither ruled that the proper foundation had not been laid for the introduction of the statement, nor excluded the statement as a violation of the discovery rule. On appeal, Ross again argues that Jones' statement to Wells was introduced for the purpose of impeachment and represented work product and was therefore exempted from the discovery rule or, in the alternative, that the trial court erred in failing to order a continuance pursuant to U.R.C.C.P. 9.04.

¶63. Prior inconsistent statements used to impeach a witness need not be disclosed to opposing counsel unless opposing counsel has requested that such statements be disclosed. *See* M.R.E. 613(a). However, if a statement is introduced into evidence not only for impeachment, but also to bolster the substantive case of a party, then the admission of the statement may nevertheless be subject to the reciprocal discovery rule under Rule 9.04 of the Uniform Code of Circuit and Chancery Practice (U.R.C.C.P.). *See, e.g.*, **Coates v. State**, 495 So. 2d 464, 466 (Miss. 1986) (finding that, where statement was impeachment evidence but also outlined defendant's substantive theory of the case, evidence was subject to the discovery rule, and the trial court's exclusion of the statement was not error); *see also* **Byrom v. State**, 863 So. 2d 836, 869 (Miss. 2003) (citing **Coates v. State** and affirming that where the statement was substantive evidence but was sought to be introduced as impeachment

35

evidence, exclusion of the evidence was proper for failure to adhere to the rules of reciprocal discovery). This principle prevents a party from circumventing discovery rules by arguing that evidence was used merely for impeachment purposes. ***Coates***, 495 So. 2d at 466. In the present case, while elements of the statement taken by Wells might have been used to impeach Jones' testimony, introduction of the entire statement as impeachment testimony would have been inappropriate since a crucial element of Ross' defense was undermining Jones' credibility. Therefore, though the proper foundation was laid for the introduction of impeachment evidence, Wells' statement should not have been admitted as impeachment evidence, since it tended to prove Ross' theory of the case.

¶64. Ross argues in the alternative that the statement taken by Wells was work product and therefore exempted from discovery. U.R.C.C.P. Rule 9.04(B)(1) excludes attorney work product from discovery.[6] "Work product" encompasses materials that contain the "opinions, theories or conclusions" of the attorney. The statement, while indicative of the defense's approach, did not contain opinions, theories, or conclusions, and was therefore not work product for the purposes of discovery. Because the statement was not introduced solely for impeachment and did not constitute work product, defense counsel's failure to disclose the statement to the State was a violation of the discovery rule.

¶65. Ross maintains that, even if the failure to disclose was a discovery violation, the trial court erred in conclusively excluding it, rather than allowing the State to review the statement

---

[6]U.R.C.C.P. 9.04(B)(1). *Work Product*. Disclosure shall not be required of legal research or of records, correspondence, reports, or memoranda to the extent that they contain the opinions, theories, or conclusions of the prosecuting or defense attorney or members of legal staff.

and request a continuance, if necessary. Ross correctly notes that, in making discovery rulings, trial courts must adhere to the guidelines first articulated in **Box v. State**, 437 So. 2d 19 (Miss. 1983), and later codified in U.R.C.C.P. 9.04(I).[7] Under Rule 9.04(I), evidence offered by a defendant in violation of the discovery rule cannot be rejected out of hand. **Carraway v. State**, 562 So. 2d 1199, 1203 (Miss. 1990). Instead, the State must be given the opportunity to meet the evidence and determine whether a motion for a continuance or a motion for a mistrial is necessary. Exclusion of the evidence is an extreme sanction and is only appropriate where the defendant's discovery violation was "willful and motivated by a desire to obtain a tactical advantage." **Darghty v. State**, 530 So. 2d 27, 32 (Miss. 1988) (citing **Taylor v. Illinois**, 484 U.S. 400, 415, 108 S. Ct. 646, 655, 98 L. Ed. 2d 798, 814

---

[7]U.R.C.C.P. 9.04(I). *Discovery*. If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:

1.  Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and

2.  If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.

3.  The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.

The court shall follow the same procedure for violation of discovery by the defense.

(1988)).  Relying on ***Taylor***, we have held that exclusion "ought be reserved for cases in which the defendant participates significantly in some deliberate, cynical scheme to gain a substantial tactical advantage." ***Houston v. State***, 531 So. 2d 598, 612 (Miss. 1988).  In all discovery matters, we are guided by our statement in ***Houston v. State***:

> We must never forget, however, that the trial for life or liberty is not a game and that discovery rules, like other rules of procedure, are not an end in and of themselves but a means to the end that we dare call justice. To that end, we administer our discovery rules with a strong bias in favor of the court and jury receiving and considering all relevant and otherwise admissible evidence.

***Houston,*** 531 So. 2d at 611.

¶66.    In the present case, the trial court erred in failing to consider the admission of the statement in accordance with Rule 9.04(I).  Nothing in the record indicates that defense counsel deliberately attempted to ambush the State with new evidence.  The trial court did not find that the introduction of the statement was motivated by a desire to gain a tactical advantage.  The State cannot claim that the introduction of the statement caught it unaware, since the statement was given by its own witness.

¶67.    However, failure to follow Rule 9.04(I) does not inexorably require reversal.  Rule 103 of the Mississippi Rules of Evidence stipulates that error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and a timely objection is made, or the substance of the evidence was made known to the court by an offer of proof or was apparent from the context within which questions were asked.  The admission or exclusion of evidence constitutes reversible error only where a party can show prejudice or harm.  ***Jackson v. State*** 594 So. 2d 20, 25 (Miss. 1992).  The

38

relevant inquiry therefore is whether the trial court's failure to adhere to Rule 9.04(I) prejudiced Ross.

¶68.     This Court has found prejudice where the trial court fails to follow the *Box* guidelines in excluding testimony that tended to support a defendant's account of events. *See Darghty v. State*, 530 So. 2d 27, 33 (Miss. 1988) ("Even-handed application of the Rule requires the same procedure to be followed when the State objects to testimony because of a defendant's violation as when the defendant objects for the same reason. . . . [the] testimony being relevant and competent, it was prejudicial error to exclude it without following our procedural guidelines. Accordingly, we reverse and remand for another trial."). While Ross was allowed to impeach Jones with her prior statement on cross-examination, the exclusion of that statement from evidence did prejudice his case. Jones' testimony was the only direct evidence linking Ross to the crime. The jurors recognized the importance of her credibility, as evidenced by one juror's request to see the transcript. Given that Jones' credibility was the crucial issue in this case, and in light of the severity of the crime charged, we find that the trial court committed reversible error in excluding her statement from evidence without conducting a *Box* hearing pursuant to Rule 9.04(I).

### III.     PROSECUTORIAL MISCONDUCT

¶69.     Ross argues that the district attorney committed misconduct in his closing argument in the guilt phase and sentencing phases of the trial by (A) attacking the character and honestly of opposing counsel, (B) making personal observations about the veracity of a witness, and (C) referencing information not submitted into evidence.

¶70. Attorneys are afforded wide latitude in arguing their cases to the jury but are not allowed to employ tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury. *Sheppard v. State*, 777 So. 2d 659, 661 (Miss. 2001). We will review allegations of misconduct to determine "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Id*. In deciding the propriety of allegedly improper comments, we will consider them in the context of the case. *Ahmad v. State*, 603 So. 2d 843, 846 (Miss. 1992). A series of otherwise harmless errors in a closing argument may be grounds for reversal where, in the aggregate, those errors violate a defendant's right to a fair and impartial trial. *Howell v. State*, 411 So. 2d 772, 776 (Miss. 1982) (series of inappropriate comments by prosecution during closing argument grounds for reversal for violation of due process).

¶71. Ross failed to object to a number of the statements about which he now complains. In general, the failure to object to the prosecution's statements in closing argument constitutes a procedural bar. *Spicer v. State*, 921 So. 2d 292, 309 (Miss. 2006). This contemporaneous objection rule applies in death penalty cases and may apply to the prosecution's closing argument. *Williams v. State*, 684 So. 2d 1179, 1203 (Miss. 1996). However, in extreme cases, a failure to object to questions which were violative of a constitutional right will not act as a procedural bar to consideration. *Wood v. State*, 257 So. 2d 193, 200 (Miss. 1972) (finding that consideration of inappropriate cross-examination by the State was not barred by defendant's failure to object). *See also Mickell v. State*, 735 So. 2d 1031, 1035 (Miss. 1999) ("[I]n cases of prosecutorial misconduct we have held [that] this

40

Court [is not] constrained from considering the merits of the alleged prejudice by the fact that objections were made and sustained, or that no objections were made."); *Griffin v. State*, 557 So. 2d 542, 552 (Miss. 1990) ("Even without a timely objection, reversal may be required when the prosecuting attorney has commented upon the defendant's right not to testify.") (citations omitted).

### A.  Statements Allegedly Impugning the Honesty and Character of Opposing Counsel.

¶72.  In the State's closing argument during the guilt phase of the trial, the district attorney made a number of statements that Ross argues were insulting to defense counsel. Indicative of these statements was the beginning of the State's closing argument: "I don't know if it's necessary to address the defense's case or not. I think you have seen a textbook violation of closing argument by [defense counsel]." While these and other statements are provocative, we find that they fall within the wide discretion granted to parties in closing argument. *Sheppard*, 777 So. 2d at 661.

### B.  Prosecution's Observation on the Veracity of a Witness.

¶73.  The district attorney noted Jones had testified that Ross told her that killing Yancey "didn't bother him at all," and told the jury "I don't think it did." Ross argues that bolstering a witness's credibility in this manner was error, but cites no authority for this principle. Such statements are permissible given the wide latitude granted to parties in closing argument. *Sheppard*, 777 So. 2d at 661.

### C.   References to Information not in Evidence.

¶74. Ross alleges that the State impermissibly implied that Ross had been seen at the crime scene. In general, parties may comment upon any facts introduced into evidence, and may draw whatever deductions and inferences that seem proper from the facts. *Bell v. State*, 725 So. 2d 836, 851 (Miss. 1998) (collecting authorities). Arguing statements of fact which are not in evidence or necessarily inferable from facts in evidence is error when those statements are prejudicial. *Blue v. State*, 674 So. 2d 1184, 1214 (Miss. 1996), *overruled on other grounds*, *King v. State*, 784 So. 2d 884 (Miss. 2001); *see Randall v. State*, 806 So. 2d 185, 212-14 (Miss. 2001) (reversing and remanding for new trial in death penalty appeal partly because the prosecutor attempted to infer guilt from the sudden absence of gunpowder residue when absence of gunpowder residue was not in evidence); *West*, 485 So. 2d at 689-90 (reversing and remanding for new trial in death penalty appeal partly because the prosecutor inappropriately implied in closing argument the defendant had threatened teenaged witnesses); *Augustine v. State*, 201 Miss. 277, 28 So. 2d 243, 244-47 (1946) (reversing and remanding for new trial partly because the prosecutor made references to facts not on the record, including, but not limited to, references to a gun used to commit the crime when there was no evidence of a gun on the record). An arguing party may not appeal to a juror's prejudice by injecting prejudices not contained in some source of the evidence. *Sheppard*, 777 So. 2d at 661 (citing *Nelms & Blum Co. v. Fink*, 159 Miss. 372, 131 So. 817, 821 (1930)).

¶75. Former Tippah County Sheriff Gary Mauney testified that, the morning after Yancey's murder, an unidentified party somewhere near the crime scene stated that Ross was around Yancey's residence the day he was killed. Sheriff Mauney wrote Ross' name on a "crime

42

scene sign-in sheet" used to record the individuals interviewed at the crime scene. Mauney emphasized, however, that Ross was not actually at the crime scene when he wrote his name down. This sign-in sheet was not entered into evidence and was not identified for the record. In its closing argument, the State first argued that, based on Mauney's notes, Ross had been at the crime scene the day before the murder. Defense counsel objected to the State's arguing matters not in evidence, and the court instructed the jury to disregard the statement. Later in its closing argument, the State again made reference to the sign-in sheet, stating that Ross' name "appeared" on the sheet, and that "that's the first time we hear about Charles Ross." No objection was made to the second statement. Ross argues that these statements erroneously suggest that Ross was present at the crime scene.

¶76.    This Court has reversed and remanded cases in which the prosecutor inappropriately made references in closing argument to supposed inconsistencies between two statements the defendant had made, one recorded on tape and one unrecorded, because neither statement was in evidence. *Flowers v. State*, 773 So. 2d at 329-30. In the present case, the prosecution made two references to the crime scene sign-in sheet and arguably misconstrued the significance of the sheet by initially arguing it indicated that someone had seen Ross at Yancey's residence around the time of the crime. The trial court's instruction to disregard the first statement is deemed sufficient to cure any impermissible prejudice. *See, e.g.*, *Walker v. State*, 671 So. 2d 581, 621-622 (Miss. 1995) (citing *Davis v. State*, 530 So. 2d at 694, 697 (Miss. 1988)). Nevertheless, the second reference to the crime sign-in sheet was error. Because the second reference was not as pointed as the first, we decline to reverse on these grounds. The effect of this

error on our confidence in the outcome of this trial will be considered in Section XII.

## IV.  INEFFECTIVE ASSISTANCE OF COUNSEL

¶77.   Ross argues that nearly all of his independent assignments of error are, in the alternative, evidence of ineffective assistance of counsel.  The touchstone for testing a claim of ineffectiveness of counsel must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.  *Irby v. State*, 893 So. 2d 1042, 1049 (Miss. 2004) (citing *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984)).

¶78.   The standard of review for a claim of ineffective assistance involves a two-pronged inquiry:  the defendant must demonstrate that his counsel's performance was deficient and that the deficiency prejudiced the defense of the case.  *Id*.   To establish deficient performance, a defendant must show that his attorney's representation fell below an objective standard of reasonableness.  *Davis v. State*, 897 So. 2d 960, 967 (Miss. 2004) (citing *Williams v. Taylor*, 529 U.S. 362, 390-91, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)).  To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different.  *Id*.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id*.

¶79.   The focus of the inquiry must be whether counsel's assistance was reasonable considering all the circumstances.  *Id*. at 746 (citing *Strickland*, 466 U.S. at 688).  We will not find ineffective assistance where a defendant's underlying claim is without merit.  *Id*.  Similarly, multiple defaults that do not independently constitute error will not be aggregated

44

to find reversible error. *Walker v. State*, 863 So. 2d 1, 22 (Miss. 2003). Our review is highly deferential to the attorney, with a strong presumption that the attorney's conduct fell within the wide range of reasonable professional assistance. *Howard v. State*, 853 So. 2d 781, 796 (Miss. 2003) (citing *Hiter v. State*, 660 So. 2d 961, 965 (Miss. 1995)). However, an attorney's lapse must be viewed in light of the nature and seriousness of the charges and the potential penalty. *State v. Tokman*, 564 So. 2d 1339, 1343 (Miss. 1990) (citing *Washington v. Watkins*, 655 F.2d 1346, 1356-57 (5th Cir. 1981)).

A.     **Tainted Venire Panel**.

¶80.    As noted in Section I(B), during the voir dire of prospective jurors, venire member Martindale noted that she had testified against Ross in federal court and, separately, that she had been the victim of a crime. Defense counsel failed to object to her statements at the time, did not have her removed after her initial statement that she had testified against Ross, did not request a curative instruction from the court, and did not query the remaining venire members about possible prejudice induced by the statement after she was removed. Martindale was subsequently struck for cause.

¶81.    Defense counsel undoubtedly erred in failing to conduct even a cursory inquiry into the identity of the venire members. Ross' counsel had actual knowledge of Martindale's identity because testimony during a pre-trial bond hearing specifically noted that she had been the victim of Ross' prior armed bank robbery and had subsequently testified against him. Similarly, while defense counsel's decision not to object to Martindale's first statement immediately after she made it may well have been sound trial strategy, their failure to take actions to remove Martindale from the panel before she made her second statement cannot

45

be considered the product of reasonable strategy. It is true that evidence of the bank robbery was introduced in the sentencing phase, but that is irrelevant to prejudice suffered during the guilt phase, particularly after the second statement. These substantial lapses likely fall below an objective standard of reasonableness and therefore constitute error, but we cannot say from the record that Ross suffered prejudice.

> **B. Failure to Lay Necessary Foundation to Introduce the Statement Taken by Herbert Wells.**

¶82. The statement given by Jones to Wells was taken on September 10, 1997, nineteen days before Ross' trial began. At trial, defense counsel argued that the statement was for impeachment purposes, or in the alternative, was work product, and therefore did not have to be disclosed. Whether it was an omission or a misguided trial strategy, the decision substantially prejudiced Ross because it precluded him from introducing into evidence the substantial inconsistencies between Jones' statements to police and her statement to Wells. However, because we cannot say that defense counsel's failure to introduce the statement was not trial strategy, we do not find reversible error.

> **C. Failure to Investigate Potential Mitigating Evidence and Failure to Effectively Present Relevant Mitigating Evidence at the Penalty Phase.**

¶83. During the sentencing phase of the trial, defense counsel offered as mitigating evidence the testimony of Ross' mother, grandmother, and daughter, a minister at the jail where Ross had been incarcerated since his arrest, and the sheriff who had arrested Ross in 1989 for armed bank robbery. Ross also testified in his own defense. Much of the testimony concerned the witnesses' opinions of Ross' character. A substantial portion of defense counsel's case for mitigation relied on their characterization that Ross was a "good prisoner"

46

and functioned appropriately in the prison system. On cross-examination of Ross, the State challenged this characterization, noting that Ross had been moved from a county jail to a higher security facility for possession of a hacksaw and attempting to escape and that he had been punished in federal prison for making alcoholic beverages in his cell. During Ross' competency hearing pending appeal, defense counsel confessed that they were stunned when Ross admitted making alcoholic beverages in prison and "about fell through [their] seats." Ross also argues his attorney was ineffective for failing to conduct an adequate investigation into potentially mitigating factors such as Ross' psychological problems and for failing to obtain an expert to testify to these factors.

¶84. While courts must defer to lawyers' judgments and strategies, "at a minimum, counsel has a duty to interview potential witnesses and to make independent investigation of the facts and circumstances of the case." *Ferguson v. State*, 507 So. 2d 94, 96 (Miss. 1987). Under this standard, counsel may be deemed ineffective for relying almost exclusively on material furnished by the State during discovery and conducting no independent investigation. *Id*. While counsel is not required to exhaust every conceivable avenue of investigation, he or she must at least conduct sufficient investigation to make an informed evaluation about potential defenses. *State v. Tokman*, 564 So. 2d at 1343. Under *Strickland*, counsel has a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

¶85. Our state case law has not extensively addressed what constitutes adequate investigation into mitigating circumstances. *See, e.g.*, *Brown v. State*, 749 So. 2d 82, 90-91 (Miss. 1999) (defendant entitled to hearing on ineffective assistance where defense counsel

47

had a psychological evaluation administered but failed to submit a mitigation report on the evaluation); *Foster v. State*, 687 So. 2d 1124, 1131-32 (Miss. 1996) (decision not to investigate potentially mitigating psychological factors was reasonable and strategic because a preliminary competency hearing found that defendant had no psychotic disorder or organic mental disorder); *Ladner v. State*, 584 So. 2d 743, 757 (Miss. 1991) (counsel not ineffective where court-appointed psychologist performed comprehensive evaluation and found no mitigators).

¶86.    In such cases, the jurisprudence from other jurisdictions proves useful.  For example, where defense counsel has sought and acquired a psychological evaluation of the defendant for mitigation purposes, counsel generally will not be held ineffective for failure to request additional testing.  *Moore v. Parker*, 425 F.3d 250, 254 (6th Cir. 2005); *Hall v. United States*, 2004 U.S. Dist. LEXIS 17089, *73 (D. Tex. 2004).  Similarly, defense counsel cannot be held ineffective for failing to discover a mitigating factor, such as organic brain damage, that the defendant cannot show exists in any post trial motion.  *Thompson v. Bell*, 315 F.3d 566 (6th Cir. 2003).

¶87.    In each of these cases, counsel will not be deemed ineffective if there is proof of investigation or if there is no factual basis for the defendant's claim.  However, each of these principles presuppose a certain level of investigation.  By contrast, "strategic choices made after less than complete investigation will not pass muster as an excuse when a full investigation would have revealed a large body of mitigating evidence." *Dickerson v. Bagley*, 453 F.3d 690, 696-697 (6th Cir. 2006).  "It is not reasonable to refuse to investigate when the investigator does not know the relevant facts the investigation will uncover." *Id.*

In the present case, Ross undoubtedly alleges facts which demonstrate a need to develop mitigating evidence based on potential psychological problems. The Mississippi State Hospital at Whitfield conducted a psychological evaluation of Ross and discovered a number of potential mitigating factors, including accounts of physical and sexual abuse, possible alcoholism, accounts of visual and auditory hallucinations, and the deaths of his ex-wife and four young children in a car accident in 1985 and the brutal murder of his sister in 1982. The supplemental record also reveals that, at the time of his examination, Ross was taking anti-psychotic medication and medication for depression. While Ross testified to the death of his family, physical abuse as a child, and his drinking problems, and his mother testified to the murder of his sister, defense counsel provided no expert evidence about how these events had affected Ross psychologically. The record provides no evidence that defense counsel knew about Ross' hallucinations or the circumstances which would eventually lead to his taking medications for psychological disorders. When asked why he did not try to develop this line of mitigation evidence for his client, Ross' defense counsel stated that Ross maintained he wasn't "crazy." Defense counsel's failure to investigate beyond this single declaration cannot be considered reasonable given the serious mitigating issues evident in the post-trial competency hearing.

¶88. Far more problematic was defense counsel's apparent failure to properly investigate Ross' record as an inmate. Defense counsel asserted in opening statements that Ross had been a "good prisoner" since his arrest, but put on only the most superficial evidence of this fact. In doing so, they opened the door for the State to introduce Ross' previous bad acts into evidence. This failure falls below an objective standard of reasonableness and was

49

undoubtedly highly prejudicial, as it tended to cast Ross as unrepentant, a habitual criminal, and a danger to society. Given the severity of the charge against Ross, defense counsel's failure to investigate Ross psychological problems and his disciplinary record in prison substantially undermines our faith in Ross' sentence, and therefore constitutes ineffective assistance of counsel for the sentencing phase of the trial. *Davis*, 897 So. 2d at 967; *Tokman*, 564 So. 2d at 1343.

## V. COMPETENCY HEARING

¶89.    On appeal, Ross claims that the competency hearing conducted by the trial court and approved by this Court was deficient in three respects: first, for placing the burden on Ross of proving his lack of competency by a preponderance of the evidence; second, for the trial court's denial of Ross' motion for a continuance to consider the testimony of the examining physician; and third, for the trial court's failure to address Ross' motion to retain an independent expert to examine Ross.

¶90.    The United States Supreme Court recognizes that the allocation of the burden of proof in competency hearings in criminal trials lies squarely within the discretion of state courts, and specifically that the allocation of the burden of proof to the defendant does not offend due process. *Medina v. California*, 505 U.S. 437, 449-52; 112 S. Ct. 2572, 2579-81; 120 L. Ed. 2d 353, 366-68 (1992). Where there is a serious question about the sanity or competency of a defendant to stand trial, "it naturally devolves upon the defendant to go forward with the evidence to show his probable incapacity to make a rational defense." *Emanuel v. State*, 412 So. 2d 1187, 1189 (Miss. 1982); *see also Evans v. State*, 725 So. 2d 613, 660 (Miss. 1997). The defendant must show incompetency by a preponderance of the evidence. *Griffin v.*

50

***State***, 504 So. 2d 186, 191 (Miss. 1987).  The trial court therefore did not err in placing the burden of proof on Ross.

¶91.    Similarly, the decision to grant or deny a motion for a continuance is within the sound discretion of the trial court and will not be reversed unless the decision results in manifest injustice.  *See*, *e.g.*, ***Cox v. State***, 849 So. 2d 1257, 1267 (Miss. 2003).  After conducting his examination of the psychologist who examined Ross, Ross' appellate counsel renewed a previously off-the-record motion for a continuance to review material that he maintained had only been made available to him the day of the hearing.  The trial court found that witnesses had been called up from the Mississippi State Hospital and that the case would not be well served by having the witnesses make repeated trips.  The record does not reflect that Ross' appellate counsel was unfamiliar with the evaluation results or that he was unable develop his case through the examination of witnesses.  The trial court's determination was within its discretion.

¶92.    Finally, Ross alleges that the trial court's failure to address his motion for an independent expert constituted reversible error.  However, the record reveals that the trial court was amenable to hearing Ross' motion at an appropriate time.  There is no evidence in the record that Ross further pursued his motion.  A defendant has the obligation to secure a ruling on his motion for an independent expert, and failure to do so constitutes a procedural bar.  ***Berry v. State***, 728 So. 2d 568, 570 (Miss. 1999) ("It is the responsibility of the movant to obtain a ruling from the court on motions filed by him and failure to do so constitutes a waiver of same.").  Even if Ross were not procedurally barred, a defendant is not entitled to a favorable mental health evaluation, but only to a competent psychiatrist and an appropriate

51

examination. *Jordan v. State*, 912 So. 2d 800, 818 (Miss. 2005); *Byrom v. State*, 863 So. 2d 836, 852 (Miss. 2003). The trial court cannot be faulted for failing to rule on a motion never formally before it. This assignment of error is without merit.

## VI. *ATKINS* HEARING

¶93. In *Atkins v. Virginia*, 536 U.S. 304, the United States Supreme Court held that the execution of mentally retarded inmates amounted to cruel and unusual punishment and was therefore prohibited by the Eighth Amendment. Ross argues that in light of this decision his sentence must be vacated and his case remanded to the trial court for an evaluation of his mental capacity. Ross maintains that although he was given both an I.Q. test and a personality index by the Mississippi State Hospital, those tests were administered to establish his competency to assist in his appeal and did not conclusively determine whether he is mentally retarded.

¶94. The record reflects that while Ross' scores on his I.Q. test were within the range of mentally retarded, the hospital's psychologist testified that in her opinion Ross was malingering and that he was not actually mentally retarded. The examining psychologist also stated that the Mississippi State Hospital had administered the Minnesota Multiphasic Personality Inventory, or MMPI, to Ross. The examining psychologist opined that the results of the MMPI were invalid because Ross intentionally malingered on the test by randomly choosing answers. Ross implicitly argues that both findings are belied by the psychologist's testimony at the competency hearing, where she admitted that Ross had difficulty understanding the implications of his trial and sentence.

¶95. A defendant will not be deemed mentally retarded for the purposes of the Eight Amendment unless "such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that: 1. the defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association; 2. the defendant has completed the Minnesota Multiphasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering." *Lynch v. State*, 2007 Miss. LEXIS 34, 17-18 (Miss. 2007) (citing *Chase v. State*, 873 So. 2d 1013, 1029 (Miss. 2004)). When these tests already have been administered and the results are clear from the record, re-filing an affidavit is unnecessary. *Scott v. State*, 878 So. 2d 933, 948 (Miss. 2004). In the present case, the testimony from the State's psychologist indicates that Ross was malingering and that his functioning did not fall within the range of mentally retarded. Because Ross has failed to proffer the information necessary to warrant an *Atkins* hearing, he is not entitled to a reconsideration of his sentence on this issue. *Hughes v. State*, 892 So. 2d 203, 216 (Miss. 2004). This assignment of error is without merit.

## VII. JURY INSTRUCTIONS

¶96. Ross maintains that the trial court erred in refusing the following proposed jury instructions during the guilt phase of his trial: 1-A, 2, 3, and 4. He also argues that the trial court erred in granting the State's Sentencing Instruction S-1 and in denying his sentencing phase instructions 2, 3, 4, 12, and 13.

### A. Culpability Phase Instructions.

1. *Number 4, directed verdict instruction.*

53

¶97. Ross argues that the evidence presented by the State was insufficient to support his conviction of capital murder, and that, as a result, the trial court erred in refusing Ross' proposed instruction to the jury for a directed verdict of not guilty.

¶98. Where a defendant has requested a peremptory instruction in a criminal case or after conviction moved for judgment notwithstanding the verdict, the trial judge must consider all the evidence, not just the evidence which supports the State's case, in the light most favorable to the State. *Howard v. State*, 853 So. 2d 781, 788 (Miss. 2003) (citing *Gavin v. State*, 473 So. 2d 952, 956 (Miss. 1985)) (citations omitted). The evidence which supports the case of the State must be taken as true, and the State must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. *Id*. If there is evidence of such quality and weight that reasonable, fair-minded men in the exercise of impartial judgment might reach different conclusions, then the request or motion should be denied. *Id*.

¶99. In Ross' case, there was sufficient evidence, both circumstantial and in the form of Jones' testimony, for a reasonable jury to find that Ross murdered Yancey in the commission of a robbery. The stolen goods were found in a residence where Ross had stayed the night of the murder. A car similar to Ross' had been seen and heard near Yancey's residence the night of the murder. Jones testified that Ross admitted to killing Yancey. Ross had access to a pistol of the same caliber as the firearm that killed Yancey. In light of this evidence, it was not error for the trial court to deny Ross' proposed instruction for a directed verdict.

2. *Number 1-A, circumstantial evidence instruction*.

¶100. Ross also argues that the trial court erred in refusing to instruct the jury that the case against Ross was based entirely on circumstantial evidence. When all of the evidence

54

tending to prove the guilt of a defendant is circumstantial, the trial court must grant a jury instruction that every reasonable hypothesis other than guilt must be excluded in order to convict. *Manning v. State*, 735 So. 2d 323, 338 (Miss. 1999) (citing *Givens v. State*, 618 So. 2d 1313, 1318 (Miss. 1993)). Circumstantial evidence is evidence which, without going directly to prove the existence of a fact, gives rise to logical inference that such fact does exist. *Id*. If direct evidence is before the jury, then a circumstantial evidence instruction is inappropriate. *Ladner v. State*, 584 So. 2d 743, 750 (Miss. 1991). Direct evidence may consist of a confession by the defendant, including a defendant's admission to a person other than a law enforcement officer. *Id*.

¶101. Ross concedes that Jones' testimony regarding Ross' statements to her constitutes direct testimony, but argues that Jones' testimony was so thoroughly discredited by other evidence that its weight was negligible. Therefore, he argues, the jury should have considered Ross' case to be based on circumstantial evidence. However, issues regarding weight and credibility of the evidence are for the jury to resolve. *Hughes v. State*, 735 So. 2d 238, 276 (Miss. 1999). The trial court did not err in refusing to treat Ross' case as a de facto circumstantial-evidence case.

### 3. *Numbers 2 and 3, instructions defining reasonable doubt.*

¶102. Ross argues that the trial court erred in refusing his proposed jury instruction no. 2, which defined reasonable doubt, and proposed jury instruction 3, which stated that all reasonable doubts must be resolved in favor of the defendant. He contends that the refusal of these instructions constituted reversible error because the trial court failed to offer the jury

any instruction regarding reasonable doubt. Ross' claim is not supported by the record. The trial court granted jury instruction Number 1, which read:

> The law presumes every person charged with the commission of a crime to be innocent. This presumption places upon the State the burden of proving the defendant guilty of every material element of the crime with which he is charged. *Before you can return a verdict of guilt, the State must prove to you beyond a reasonable doubt that the defendant is guilty. The presumption of innocence attends the defendant throughout the trial and prevails at its close unless overcome by evidence which satisfies the jury of his guilt beyond a reasonable doubt.* The defendant is not required to prove his innocence.

(Emphasis added). The Court also granted the State's first instruction on capital murder, which read:

> If the State of Mississippi *has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the defendant, Charles Wayne Ross, not guilty of capital murder* in the death of Hershel Ray Yancey.

(Emphasis added).

¶103. Where a jury is adequately instructed on reasonable doubt, it is not reversible error for the court to refuse to give a defense instruction on it. **Howard v. State**, 853 So. 2d 781, 791 (Miss. 2003) (citing **Holloway v. State**, 809 So. 2d 598, 606 (Miss. 2000)). Instructions nearly identical to Ross' proposed instructions have been properly excluded where existing instructions adequately address the presumption of innocence and reasonable doubt. *See* **Martin v. State**, 854 So. 2d 1004, 1009-10 (Miss. 2003) (addressing the definition of reasonable doubt); **Williams v. State**, 667 So. 2d 15, 24 (Miss. 1996) (addressing the resolution of reasonable doubt). Because Ross' proposed instructions on reasonable doubt had been adequately addressed by other jury instructions, this assignment of error is without merit.

**B.** **Sentencing Phase Instructions**.

1. *Sentencing instruction Number S-1.*

¶104. The first sentencing instruction, offered by the State and adopted by the trial court, included as one of the statutory aggravators to be considered by the jury that "the capital offense was committed for the purpose of avoiding or preventing a lawful arrest." Defense counsel objected to the inclusion of this aggravator in the instruction on three bases: first, that there was insufficient evidence to show that Ross had murdered Yancey in order to avoid arrest for the robbery; second, that the use of this aggravating circumstance had not been disclosed to Ross in the indictment; and third, that the aggravator could not be used as both a "capitalizing" offense and an aggravator in determining Ross' sentence.

¶105. An instruction detailing the aggravator of "avoiding lawful arrest" may be granted if there is evidence from which a jury may reasonably infer that a substantial reason for the killing was either to conceal the identity of the killer or to "cover their tracks" so as to avoid apprehension and eventual arrest by authorities. *Mitchell v. State*, 792 So. 2d 192, 219 (Miss. 2001) (citing *Manning v. State*, 735 So. 2d 323, 350 (Miss. 1999)). Because Ross knew Yancey personally, it was reasonable for a jury to conclude that Yancey was murdered to conceal either the identity of the killer or to avoid investigation for the robbery. The trial court committed no error in finding that there was a sufficient evidentiary basis for the instruction.

¶106. Ross' argument that the State erred in failing to state the aggravating circumstances to be used in the sentencing phase is similarly unavailing. Mississippi law does not require the aggravating circumstances to be set forth in the indictment. *See Bennett v. State*, 933 So.

2d 930, 952 (Miss. 2006); *Smith v. State*, 729 So. 2d 1191, 1224 (Miss. 1998); *Smith v. State*, 724 So. 2d 280, 296 (Miss. 1998); *In re Jordan*, 390 So. 2d 584, 585 (Miss. 1980). Rather, an indictment for capital murder puts a defendant on notice of the aggravating circumstances that may be used against him. *Bennett*, 933 So. 2d at 952; *Williams v. State*, 445 So. 2d 798, 804-05 (Miss. 1984). The State's failure to list the aggravating circumstances in the indictment was therefore no bar to their being employed in the sentencing phase of the trial. Finally, this Court has repeatedly held that evidence of the underlying crime can properly be used both to elevate the crime to capital murder and as an aggravating circumstance. *See Bennett*, 933 So. 2d at 954; *Goodin v. State*, 787 So. 2d 639, 654 (Miss. 2001); *Smith*, 729 So. 2d at 1223; *Bell v. State*, 725 So. 2d 836, 859 (Miss. 1998); *Crawford v. State*, 716 So. 2d 1028, 1049-50 (Miss. 1998). The United States Supreme Court has also held that the use of an underlying felony as an aggravator does not offend the Constitution. *Lowenfield v. Phelps*, 484 U.S. 231, 233, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988). Consequently, there was no error in granting sentencing instruction S-1.

2. *Denial of Ross' Proposed Sentencing Instructions*.

a. Proposed sentencing instruction Number 2 – statutory and non-statutory mitigation.

¶107. Ross maintains that the trial court erred in refusing his second proposed sentencing instruction, which set out elements of the crime that the State had to prove, a list of the aggravating circumstances the State would attempt to show, and a list of twenty-four non-statutory mitigators, presented as illustrations of the type of information that the jury could

consider mitigating circumstances. The crux of Ross' contention is that the refusal of this instruction impermissibly restricted the mitigation evidence the jury could consider.

¶108. Specific instructions on non-statutory mitigating circumstances need not be given, so long as a "catch-all" instruction is included that instructs the jury that they may consider any factors that they may deem mitigating in their deliberations. *See, e.g.,* ***Manning v. State***, 735 So. 2d 323, 352 (Miss. 1999). This Court has also held that "catch-all" instructions do not limit the jury's consideration of mitigating factors. ***Simmons v. State***, 805 So. 2d 352, 499 (Miss. 2001). Under the list of statutory mitigating circumstances in the first sentencing instruction, the trial court instructed the jury that they may consider:

> Any other matter, any other aspect of the defendant's character or record, and any other circumstance of the offense brought to you during the trial of this cause which you, the jury, deem to be mitigating on behalf of the defendant.

The instruction properly informs the jury about what may be considered as mitigation evidence. Therefore, the trial court's refusal of Ross' proposed instruction does not constitute error.

> b. Proposed sentencing instruction Number 3 – conviction is not itself an aggravator.

¶109. Ross argues that the trial court erred in refusing his third sentencing instruction, which stated that the fact of his conviction of capital murder was not itself an aggravator that could be considered for the purpose of punishment. However, when a jury has been instructed to consider only an enumerated list of statutory aggravating factors, there is no need for a separate instruction to this effect. *See, e.g.,* ***Walker v. State***, 913 So. 2d 198, 248 (Miss.

59

2005); *Edwards v. State*, 737 So. 2d 275, 317 (Miss. 1999). There was no error in refusing Ross' third proposed sentencing instruction.

c. Proposed sentencing instruction Number 4 – Residual doubt.

¶110. Ross contends that the trial court erred in refusing his fourth proposed sentencing instruction, which instructed jurors to consider as a mitigating circumstance the possibility of residual doubt about Ross' guilt. Both the United States Supreme Court and this Court have held that a capital defendant is not entitled to an instruction on residual doubt. *Holland v. State*, 705 So. 2d 307, 325-27 (Miss. 1997); *Franklin v. Lynaugh*, 487 U.S. 164, 174, 108 S. Ct. 2320, 101 L. Ed. 2d 155 (1988). The trial court did not err in refusing this proposed instruction.

d. Proposed sentencing instruction Number 12 – mercy instruction.

¶111. Ross maintains that the trial court erred in granting the State's first sentencing instruction and denying his twelfth proposed sentencing instruction. Ross' proposed instruction emphasized that while jurors could not consider "mere sympathy" in their culpability determination, they could, and presumably should, consider mercy or sympathy in their sentencing determination as a mitigating circumstance. The contested part of the State's instruction explained the process of balancing aggravating and mitigating circumstances to the jury:

> You must consider and weigh any aggravating and mitigating circumstances, as set forth later in this instruction, but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling.

¶112. This Court has held the above-quoted language, considered in the context of a long sentencing instruction, does not prevent the consideration of sympathy. See *Flowers v. State*, 842 So. 2d 531, 563 (Miss. 2003); *Evans v. State*, 725 So. 2d 613, 690-91 (Miss. 1997) (expressly approving of such language in the context of a long instruction). Consequently, the trial court did not err in granting the State's first sentencing instruction. Similarly, there was no error in refusing Ross' proposed instruction specifically citing mercy or sympathy as a mitigator. This Court has repeatedly held that a capital defendant is not entitled to a sympathy instruction, because, like a mercy instruction, it could result in a verdict based on whim and caprice. *See*, *e.g.*, *Howell v. State*, 860 So. 2d 704, 759 (Miss. 2003).

      e.      Proposed sentencing instruction Number 13 – weighing of aggravating and mitigating circumstances.

¶113. Finally, Ross argues that the trial court erred in denying his thirteenth instruction, which would have allowed jurors to rely on a sense of mercy to sentence Ross to life imprisonment, despite the fact that aggravators existed and were not balanced by any mitigating factors. Such an instruction is both a mercy instruction and an instruction that jurors are not bound to weigh aggravating and mitigating circumstances contemplated in the State's first sentencing instruction. This Court does not recognize a right to a mercy instruction. *Howell*, 860 So. 2d at 759. Similarly, this Court has repeatedly refused to accept instructions that would nullify the balancing of aggravating and mitigating factors, since such instructions might induce verdicts based on whim and caprice. *Manning v. State*, 726 So. 2d 1152, 1197 (Miss. 1998). The trial court did not err in refusing Ross' proposed instruction.

¶114. Because Ross has shown no error by the trial court in its rulings on jury instructions, this assignment of error is without merit.

## VIII. MITIGATION EVIDENCE

¶115. Ross argues that the trial court erred in granting the State's in limine motion to prevent Ross' family from testifying to the impact a death sentence would have on the family. The United States Supreme Court maintains that the Eighth Amendment gives capital defendants wide latitude in arguing mitigating circumstances to the jury. *See*, *e.g.*, ***McCoy v. North Carolina***, 494 U.S. 433, 441, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990). Furthermore, a state "cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence of less than death." ***Tennard v. Dretke***, 542 U.S. 274, 285, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004). "Relevant evidence" has been defined as "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. ***Lockett v. Ohio***, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L.Ed.2d 973 (1978). Consistent with this precedent, testimony regarding the impact a death sentence may have on the defendant's family is not 'relevant mitigating evidence,' because it does not address the defendant's character, record, or the circumstances of the offense. *See*, *e.g.*, ***Wilcher v. State***, 697 So. 2d 1087, 1104 (Miss. 1997) ("[T]he trial court did not err in excluding testimony from Wilcher's family that they wished for his life to be spared . . . [because] such testimony is not relevant to the defendant's character, record, or the circumstances of the offense."); ***Simon v. State***, 688 So. 2d 791, 811 (Miss. 1997) (impact of death penalty on family is not relevant to

sentencing). The trial court therefore did not err in granting the State's in limine motion. This assignment of error is without merit.

## IX. SUFFICIENCY OF THE INDICTMENT

### A. Failure to List Aggravating Circumstances.

¶116. Ross claims that the indictment was insufficient because it failed to charge all elements necessary to impose the death penalty under Mississippi law: (a) it included neither a statutory aggravating factor nor a *mens rea* element of Miss. Code Ann. § 99-19-101(5) & (7) (Rev. 2000); (b) it did not itemize the statutory aggravating circumstances that the State would rely upon; and (c) it did not provide specific notice to Ross of what the State was proposing to prove against him.

¶117. Ross cites *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), in support of his argument that the statutory aggravators and *mens rea* element must be specifically pled in the charging indictment of a state court case. However, as the Court has held, neither *Ring* nor *Apprendi* stand for this proposition, and the United States Supreme Court in both decisions specifically held it was not addressing the question of whether the aggravators must be included in the indictment. *See Apprendi*, 530 U.S. at 477 fn.3; *see also Bennett v. State*, 933 So. 2d 930, 952 (Miss. 2006). The Supreme Court has continued to hold that indictment issues in federal courts are governed by the Fifth Amendment, while indictment issues in state courts are instead governed by state law. Mississippi law does not require the aggravating circumstances to be set forth in the indictment. *See Id.*; *Smith v. State*, 729 So. 2d 1191, 1224 (Miss. 1998); *Smith v. State*, 724 So. 2d 280, 296 (Miss. 1998);

63

*In re Jordan*, 390 So. 2d 584, 585 (Miss. 1980). Rather, an indictment for capital murder puts a defendant on notice of the aggravating circumstances that may be used against him. *Bennett*, 933 So. 2d at 952; *Williams v. State*, 445 So. 2d 798, 804-05 (Miss. 1984).

¶118. While specific aggravating circumstances need not be specified in the indictment under Mississippi law, the underlying felony that elevates the crime to capital murder must be identified in the indictment along with the section and subsection of the statute under which the defendant is being charged. *See* Miss. Code Ann. § 99-17-20 (Rev. 2000). Thus, although it is not required under federal or Mississippi law, the indictment in this case included one of the aggravating circumstances.

¶119. Furthermore, this Court has repeatedly rejected similar arguments based on *Ring* and *Apprendi*, holding both of them inapplicable to Mississippi's capital sentencing scheme. *Bennett*, 933 So. 2d at 952. In *Stevens v. State*, 867 So. 2d 219, 227 (Miss. 2003), this Court held that the "defendant is not entitled to formal notice of the aggravating circumstances to be employed by the prosecution" and that any time an individual is charged with murder, he is put on notice that the death penalty may result. Additionally, in *Brown v. State*, 890 So. 2d 901, 918 (Miss. 2004), this Court rejected the argument that *Ring* and *Apprendi* require aggravators to be included in a state court indictment. *See also Knox v. State*, 901 So. 2d 1257, 1269 (Miss. 2005); *Gray v. State*, 887 So. 2d 158, 174 (Miss. 2004) ("Thus, the issue of the omission of aggravating circumstances in the indictment is without merit."); *Mitchell v. State*, 886 So. 2d 704, 711 (Miss. 2004); *Berry v. State*, 882 So. 2d 157, 173 (Miss. 2004); *Puckett v. State*, 879 So. 2d 920, 946 (Miss. 2004); *Holland v. State*, 878 So. 2d 1, 9 (Miss. 2004); *Simmons v. State*, 869 So. 2d 995, 1010 (Miss. 2004); *Stevens*, 867

So. 2d at 227 ("The State is correct in its assertion that a defendant is not entitled to formal notice of the aggravating circumstances to be employed by the prosecution and that an indictment for capital murder puts a defendant on sufficient notice that the statutory aggravating factors will be used against him."). Ross's indictment sufficiently informed him of the charges against him, and his claim is without merit.

**B.    Use of the Underlying Felony as an Aggravating Circumstance.**

¶120. Relying primarily on *Ring* and *Apprendi*, Ross maintains that the use of the underlying felony of armed robbery as an aggravating circumstance upon which the jury relied in returning a sentence was improper.  However, evidence of the underlying crime can properly be used both to elevate the crime to capital murder and as an aggravating circumstance.  *See Bennett*, 933 So. 2d at 954; *Goodin v. State*, 787 So. 2d 639, 654 (Miss. 2001); *Smith*, 729 So. 2d at 1223; *Bell v. State*, 725 So. 2d 836, 859 (Miss. 1998); *Crawford v. State*, 716 So. 2d 1028, 1049-50 (Miss. 1998).  Furthermore, the United States Supreme Court has held that there is no constitutional error in using the underlying felony as an aggravator.  *Lowenfield v. Phelps*, 484 U.S. 231, 233, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988).  The Supreme Court stated in *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994), that "[t]he aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)."

¶121.  The use of the underlying felony as an aggravator was not error.

**C.    Substitution of Aggravating Circumstances at the Close of the Sentencing Phase**.

¶122. Ross complains that, during the jury instruction conference for the sentencing phase, the State was allowed, over objection, to withdraw a jury instruction on the aggravating circumstance of murder committed by a person who had previously been convicted of a felony involving the threat of violence to persons and substitute a jury instruction on the aggravating circumstance of murder committed for the purpose of avoiding or preventing a lawful arrest. Ross argues that this last-minute substitution of aggravating circumstances violated his Fifth Amendment right to timely notice of the charges against him and his Sixth Amendment right to sufficient notice of the charges against him.

¶123. In *Gardner v. Florida*, 430 U.S. 349, 362, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977), the United States Supreme Court held that a defendant may not be sentenced to death "on the basis of information which he had no opportunity to deny or explain." However, it has already been established that an indictment for capital murder puts a defendant on notice of the aggravating circumstances that may be used against him, *Williams v. State*, 445 So. 2d 798, 804-05 (Miss. 1984), and there is no authority for the proposition that the State must furnish formal notice of aggravating circumstances in discovery. *Smith v. State*, 729 So. 2d 1191, 1124 (Miss. 1998).

¶124. Even if the substituted aggravating circumstance had been excluded, there was still sufficient proof of other aggravating circumstances to support the sentence. *Jordan v. State*, 912 So. 2d 800, 812 (Miss. 2005). If one aggravator is found to be invalid, the Court is authorized to reweigh the remaining aggravators against the mitigating circumstances. *McGilberry v. State*, 843 So. 2d 21, 29 (Miss. 2003). Upon review of the aggravating and mitigating circumstances without the contested aggravating circumstances, we find that there

66

were sufficient aggravating circumstances to justify the sentence. This assignment of error is without merit.

**D.    Sufficiency of the Habitual Offender Portion of the Indictment.**

¶125.  The portion of the indictment charging Ross as a habitual offender was on a separate page from the rest of the indictment. Ross argues that, pursuant to Section 169 of the Mississippi Constitution of 1890, the indictment concluded with the words "against the peace and dignity of the state," which were found on the first page of the indictment; and therefore, he was not properly charged as a habitual offender and could not be sentenced as such. Section 169 of the Mississippi Constitution reads:  "The style of all process shall be 'The State of Mississippi' and all prosecution shall be carried on in the name and by authority of 'The State of Mississippi,' and all indictments shall conclude 'against the peace and dignity of the State.'" Miss. Const. art. 6, § 169.  However, Ross did not challenge the sufficiency of his indictment at trial.

¶126.  Challenges to the substantive sufficiency of an indictment may not be waived and consequently may be raised for the first time on appeal. *State v. Berryhill*, 703 So. 2d 250, 254 (Miss. 1997).  For example, a challenge to an indictment for failure to charge the essential elements of a criminal offense affects a fundamental right, and may not be waived. *Jefferson v. State*, 556 So. 2d 1016, 1019 (Miss. 1989).  However, "the mere fact that a procedural requirement is located in the Constitution does not necessarily elevate it to the status of a fundamental right."  *Brandau v. State*, 662 So. 2d 1051, 1054 (Miss. 1995) (failure to conclude indictment with the words "against the peace and dignity of the State of Mississippi" did not affect a fundamental right).  We have held specifically that the inclusion

67

of the habitual offender portion of an indictment after the words "against the peace and dignity of the State of Mississippi" does not affect a fundamental right and may be waived on appeal. *Crawford v. State*, 716 So. 2d 1028, 1050-51 (Miss. 1998). Ross is therefore procedurally barred from challenging his indictment. This assignment of error is without merit.

## XI.   OVERWHELMING WEIGHT OF THE EVIDENCE

¶127. Ross argues that the trial court erred in denying his motion for a new trial. A motion for new trial challenges the weight of the evidence. When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will disturb a verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005) (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997)). We have stated that on a motion for new trial, the court sits as a thirteenth juror, and the evidence is weighed in the light most favorable to the verdict. *Id.* A finding that the verdict was against the overwhelming weight of the evidence indicates that the Court disagrees with the jury's resolution of conflicting evidence and requires a new trial. *Id.*

¶128. Though the standard of review in such cases is high, "[t]his Court has not hesitated to invoke its authority to order a new trial and allow a second jury to pass on the evidence where it considers the first jury's determination of guilt to be based on extremely weak or tenuous evidence[,] even where that evidence is sufficient to withstand a motion for a directed verdict." *Lambert v. State*, 462 So. 2d 308, 322 (Miss. 1984) (Lee, J., dissenting) (citing *Shore v. State*, 287 So. 2d 766 (Miss. 1974)); *Feranda v. State*, 267 So. 2d 305 (Miss.

68

1972); *Barnes v. State*, 249 So. 2d 383 (Miss. 1971); *Cook v. State*, 248 So. 2d 434 (Miss. 1971); *Peterson v. State*, 242 So. 2d 420 (Miss. 1970); *Hux v. State*, 234 So. 2d 50 (Miss. 1970); *Quarles v. State*, 199 So. 2d 58 (Miss. 1967); *Yelverton v. State*, 191 So. 2d 393 (Miss. 1966); *Mister v. State*, 190 So. 2d 869 (Miss. 1966); *Cole v. State*, 217 Miss. 779, 65 So. 2d 262 (1953); *Dickerson v. State*, 54 So. 2d 925 (Miss. 1951); *Jefferson v. State*, 52 So. 2d 925 (Miss. 1951); *Conway v. State*, 177 Miss. 461, 171 So. 16 (1936)); *see also Hutchins v. State*, 220 So. 2d 276 (Miss. 1969); *Brown v. State*, 219 Miss. 748, 70 So. 2d 23 (1954); *Williams v. State*, 220 Miss. 800, 72 So. 2d 147 (1954); *Martin v. State*, 197 Miss. 96, 19 So. 2d 488 (1944); *Holifield v. State*, 132 Miss. 446, 96 So. 306 (1923); *Bolden v. State*, 98 Miss. 723, 54 So. 241 (1910).  A greater quantum of evidence favoring the State is necessary for the State to withstand a motion for a new trial, as distinguished from a motion for J.N.O.V.  *Pharr v. State*, 465 So. 2d 294, 302 (Miss. 1984).

¶129.  In denying Ross' motion for a new trial, the trial court found that the jury properly weighed the evidence and determined that Ross: (1) took a wallet, television, and VCR, (2) from Yancey, (3) which belonged to Yancey, (4) against Yancey's will, (5) by shooting him four times.  Miss. Code Ann. § 97-3-79 (Rev. 2000).  However, a careful review of the evidence supporting the verdict raises serious concerns regarding the weight of the evidence considered by the jury.

### A.    The Contradictory Character of Testimony at Trial.

¶130.  The most striking aspects of the evidence used to convict Ross were the numerous and substantial inconsistencies among the testimonies of Jones, Hale, Sanders, and Donald Ross, Jr.  Although the accounts of Jones and Sanders were substantially similar, their version of

the events differed significantly from Hale's account. Of particular concern are the wide inconsistencies regarding what time Ross, Sanders, and Donald Ross, Jr. arrived at Hale's residence, in what order they arrived, and what they did with the television and VCR after Ross allegedly brought it inside.

¶131. Hale testified that Sanders and Donald Ross, Jr. were already home when Ross arrived between 9:00 and 10:00 p.m. with the television and VCR. He was certain it was not as late as 11:30 p.m. Jones disagreed, testifying Ross arrived at the Hale residence first, around 11:30 p.m., followed by Sanders and Donald Ross, Jr. who she says arrived just before midnight. Jones' account at trial also differs from her statement to Wells, in which she stated that Ross arrived at Hale's residence between 8:30 and 9:00 p.m.

¶132. Hale testified Sanders repaired the television, and then they all watched it together on Friday night. This conflicts with Sanders' testimony, in which he stated that he repaired the broken cord on the television the next morning at the request of Ross. Sanders' account also conflicts with Jones' testimony, in which she stated that she, Hale, and Sanders went into town early that morning.

¶133. Jones' testimony about the circumstances under which Ross showed her the gun and the wallet also conflicts with her statement to Wells and Hale's testimony at trial. At trial, Jones testified that Ross took her into a bedroom and showed her a three-fold wallet. In her statement to Wells, she stated that Ross had shown her the wallet outside the trailer. Both stories conflict with Hale's testimony, in which he said he never saw Jones and Ross go outside or into a bedroom alone. At trial, Jones testified that Ross then took some paper out of his car, placed it on a charcoal grill, laid the wallet on top of it, and used the paper to burn

70

the wallet. In her statement to Wells, Jones said Ross took the papers out of the wallet and used them to start the fire.

¶134. In addition to these inconsistencies, several aspects of Jones' testimony at trial appear implausible. Jones testified that after Ross confessed to murdering Yancey, he pulled the gun out from under the seat of his car, showed it to her, and tossed it over his head backwards with a "little flip." At trial she emphasized that Ross casually tossed the gun over his shoulder. However, the gun was found in a sewage ditch sixty-five feet from where she said Ross had tossed it. When confronted with this inconsistency, her only reply was that substantial time had elapsed since Ross' confession. Similarly, Jones' testimony was the only evidence supporting the State's contention that Ross had burned Yancey's wallet on a charcoal grill outside Hale's residence. Jones testified that Ross showed her Yancey's wallet, then either took paper out of his car or out of Yancey's wallet, and used the paper to set the wallet on fire. She further testified that Ross had not used any accelerant to destroy the wallet. This testimony conflicts with the opinion of Deputy Wilbanks, who collected the ashes and opined that a wallet could not have been destroyed without some sort of accelerant. At trial, Jones testified that she was not certain if the wallet was totally destroyed, which conflicted with her statement to Wells, in which she stated that the wallet had been completely reduced to ashes.

¶135. Considered in isolation, these inconsistencies and implausible accounts might be regarded merely as a matter of witness credibility to be determined by a jury. *See, e.g.,* ***Hughes v. State***, 724 So. 2d 893, 896 (Miss. 1998). However, the fact that Jones' testimony was often inconsistent and implausible weighs against its trustworthiness, particularly in a

capital case. *See Cole v. State*, 217 Miss. 779, 786-87, 65 So. 2d 262, 264-65 (Miss. 1953) (finding, in case of reversal based on the overwhelming weight of the evidence, State's key witness was incredible since "[n]ot one, but a number of aspects of [the witness's] testimony, when considered together, [made] it an exceedingly improbable and unreasonable story").

### B. Inconclusive Circumstantial Evidence.

¶136. Absent Jones' testimony, the bulk of the evidence against Ross was inconclusive, circumstantial, or did not implicate Ross any more than it did the other occupants of Hale's residence. The State's case relied on a number of items in evidence whose relevance was questionable. For example, the State provided no support for their argument that the tail light fragments came from Ross' car. The State made no showing that the ashes found on the grill had been properly preserved or what their composition was. The State noted that the beer cans collected from Ross' car had the same manufacturer's stamp as those found at the crime scene, but never explained how many cans would have the same stamp. The State argued that the vehicle heard by Yancey's neighbors was Ross' car, which ran loudly because it did not have a muffler. However, other individuals admitted driving the car at some point on the night of the murder. Yancey's neighbor said she saw a small person working on a car in her yard, a description which could have fit Ross or Sanders. All the individuals staying at Hale's residence would have had access to Hale's pistol. Finally, the stolen television and VCR were found in Sanders' bedroom.

### C. The Balance of Evidence.

¶137. The lack of substantial direct evidence against Ross is troubling, particularly given the inconsistencies in Jones' testimonies. Ultimately, however, we cannot find that the trial

court erred in denying Ross' motion for a new trial. Absent from the record are the myriad nuances and subtle impressions from which jurors weigh credibility, and this Court must be wary of encroaching on the peculiar province of the jury. We therefore decline to find that Ross' conviction was against the overwhelming weight of the evidence. Its effect on our cumulative harmless error analysis will be considered in Section XII.

## XII. CUMULATIVE ERROR

¶138. Ross argues the cumulative effect of the various errors in the trial, even if harmless, requires reversal and remand. The cumulative error doctrine stems from the doctrine of harmless error, codified under Mississippi Rule of Civil Procedure 61. It holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial. *Byrom v. State*, 863 So. 2d 836, 847 (Miss. 2003). As an extension of the harmless error doctrine, prejudicial rulings or events that do not even rise to the level of harmless error will not be aggregated to find reversible error. As when considering whether individual errors are harmless or prejudicial, relevant factors to consider in evaluating a claim of cumulative error include whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged. *See, e.g., Leonard v. State*, 114 Nev. 1196, 1216, 969 P.2d 288, 301 (Nev. 1998) (citing *Homick v. State*, 112 Nev. 304, 316, 913 P.2d 1280, 1289 (1996)). That is, where there is not overwhelming evidence against a defendant, we are more inclined to view cumulative errors as prejudicial. In death penalty cases, all genuine doubts about the harmlessness of error

73

must be resolved in favor of the accused because of the severity of the punishment. *See Walker v. State*, 913 So. 2d 198, 216 (Miss. 2005).

¶139. In the present case, we find reversible error in the failure of the trial court to adhere to Rule 9.04(I) in excluding the statement of Margaret Jones taken by Ross' investigator. Similarly, defense counsel's failure to investigate substantial mitigating factors during the sentencing phase requires reversal of Ross' sentence. Arguing that Ross' life should be spared because he could have functioned appropriately as a prisoner was not a valid defense given Ross' disciplinary record in prison. During the sentencing, defense counsel also failed to address substantial non-statutory mitigating factors noted by the state mental hospital. Other errors provide further justification for reversal because of their cumulative effort. These include the State maintaining in closing argument that Ross had been seen at the crime scene when he had not; defense counsel's failure to explore the possible tainting of the venire panel, particularly after Martindale's second prejudicial statement; and the exclusion of the State's ballistics report from evidence, which took a tangible document away from Ross that could have been argued to the jury. These errors are of particular concern because much of the State's case against Ross, absent the inconsistent testimony of Margaret Jones, was indirect. We therefore reverse Ross' conviction and sentence and remand his case for a new trial.

## CONCLUSION

¶140. We do not reverse a conviction lightly and recognize that no trial is perfect. *See Walker v. State*, 913 So. 2d 198, 250 (Miss. 2005). However, the gravity of a death penalty

74

case demands that we sanction a conviction and sentence only where there are no genuine doubts as to their validity.

¶141. Because the independent and cumulative errors during the guilt and sentencing phases of the trial denied Ross a fundamentally fair trial, we reverse Ross' conviction and sentence and remand this case for a new trial consistent with this opinion.

¶142. **REVERSED AND REMANDED**.

**SMITH, C.J., COBB, P.J., DIAZ, GRAVES AND DICKINSON, JJ., CONCUR. RANDOLPH, J., CONCURS IN RESULT ONLY. DIAZ, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, P.J., GRAVES AND DICKINSON, JJ. EASLEY, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON, J.**

**DIAZ, JUSTICE, SPECIALLY CONCURRING:**

¶143. I wholeheartedly concur with the majority's opinion that we must reverse and remand this case for a new trial because of pervasive errors during both the guilt and sentencing phases. Yet I am compelled to write because prospective jurors were improperly struck, violating both the constitutional rights of Charles Wayne Ross and also those of the jurors.

¶144. It is a bedrock tenet of American law that "[t]he very idea of a jury is a body . . . composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds." *Batson v. Kentucky*, 476 U.S. 79, 87, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986) (internal quotations and citations omitted). Accordingly, the "jury has occupied a central position in our system of justice by safeguarding a person accused of crime against the arbitrary exercise of power by prosecutor or judge." *Id.* Therefore "[t]hose on the venire must be 'indifferently chosen,' to secure the defendant's right under the

75

Fourteenth Amendment to 'protection of life and liberty against race or color prejudice.'" **Id.** (internal quotations and citations omitted).

¶145. The right to an impartial jury does not just flow to the accused in a criminal case, for "[r]acial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try," but also the juror who has been discriminated against and, by extension, the greater whole of the community. **Id.** at 87. "[B]y denying a person participation in jury service on account of his race, the State [also] unconstitutionally discriminate[s] against the excluded juror." **Id.**

¶146. In Mississippi, we have specifically noted that this constitutional prohibition against juror discrimination extends to all citizens, regardless of race. As we declared in **State v. Rogers**, "[w]hile **Batson v. Kentucky** . . . has predominately been a tool to deter discrimination against African Americans or other minorities, this is not the purpose of the ruling." 847 So. 2d 858, 862 (Miss. 2003). Instead, "[t]he purpose is to afford a fair and impartial trial to defendants *regardless of their race*." **Id.** (emphasis added).

¶147. In our increasingly diverse society, this means the prohibition on discrimination must be respected against all races so that we may honor the critical balancing role the jury plays in our country. *See* **Batson**, 476 U.S. at 87 ("For a jury to perform its intended function as a check on official power, it must be a body drawn from the community"). Nor may the prohibition against discrimination be invoked only by the accused; the State may also invoke **Batson**. For "[r]egardless of who invokes the discriminatory challenge, there can be no doubt that the harm is the same–in all cases, the juror is subjected to open and public racial discrimination." **Rogers**, 847 So. 2d at 862 (internal quotations and citations omitted).

76

¶148. It also does not matter whether the accused and a prospective juror share the same race, as a defendant may object to race-based peremptory challenges regardless of race. *See Powers v. Ohio*, 499 U.S. 400, 11 S.Ct. 1364, 113 L.Ed.2d 411 (1991). This is not because the dismissed jurors may have been predisposed to favor the defendant, but rather "because racial discrimination in the selection of jurors casts doubt on the integrity of the judicial process, and places the fairness of a criminal proceeding in doubt." *Id.* at 411 (internal quotations and citations omitted). Likewise, the same reasoning behind the prohibition against racial discrimination has also been recognized to prohibit gender-based discrimination. Ultimately, "[d]iscrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process." *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 140, 114 S.Ct. 1419, 128 L.Ed. 2d 89 (1994).

¶149. In the case at hand, the venire panel gathered for the trial of Ross consisted of sixty-five white members and six African-Americans. Every one of the black jurors were struck. The prosecution used its remaining two peremptory strikes against prospective jurors 24 and 25, Wendy Gillard and Sonya Gillard.[8]

¶150. In her questionnaire, Wendy Gillard indicated that she was a lifelong resident of Tippah County, spending the entirety of her twenty-seven years there. She had no criminal history and never knew anyone who had been the victim of a violent crime, and attended her Baptist church every Sunday and Wednesday night for services. Her hobbies were exercise

---

[8]The record does not reflect whether the prospective jurors were related.

and reading, and she read the Memphis *Commercial Appeal* and the Tippah County *Southern Sentinel* each week. She had been working at the Carrier Corporation but had been laid off the month before she was called for jury duty. She regularly watched the local news.

¶151. Prospective juror 25, Sonya Gillard, was employed by Carrier as a production tech. She had worked with Carrier for five years. She had also studied at Northeast State, the technical college in Blountville, Tennessee, and attended her Baptist church most Sundays. She read the *Commercial Appeal* on a daily basis, read the *Southern Sentinel*, and watched the local news. She had no criminal history and never knew anybody that was involved in a violent crime.

¶152. Prospective jurors 24 and 25 attend their churches regularly; work at local businesses; and take the local papers. They both were registered to vote and both showed up for jury duty when called. On paper, they seem like the ideal cross-section of the community.

¶153. Yet the State struck them. Counsel for Ross opposed the strikes, offering only that "we would object to him removing the last two black jurors I think we've got on this panel." In response, the prosecutor offered that "Juror 24, Wendy Gaillard [sic], is 27 years old. She's single; and the same goes for juror number twenty-five, Sonya Gaillard [sic]. She's 23 years old. She's young. She's single. We believe there is sufficient ties to the community." The State apparently meant to offer that the prospective jurors did not have sufficient ties to the community.

¶154. In upholding the strikes, the only analysis offered by the trial court was that "the defendant in this case is not a member of a recognizable minority . . . [t]here not even being an issue of minority or establishing of a pattern, I'm not going to require the State to keep

78

them. I'm going to excuse them." Ross is white and the prospective jurors were black, but as examined *supra* the law makes no distinction on this point. Both this Court and the United States Supreme Court have made clear that **Batson** applies no matter the race of the accused or the potential juror. **Powers**, 499 U.S. at 411; **Rogers**, 847 So. 2d at 862. Although the trial court subsequently recognized that **Batson** and its progeny do not require that the objecting party be a member of the same racial group as the party struck, it did not revisit the earlier ruling allowing the peremptory strikes of the prospective jurors. The trial court's misapplication of the law is therefore reversible error.

¶155. Even if the trial judge had used the correct standard of law, the proper analysis under **Batson** and our previous case law was not performed. *See* **Rogers**, 847 So. 2d at 862 (outlining the burden-shifting process in determining if there has been purposeful discrimination). If such a process was used it is doubtful that Wendy Gillard and Sonya Gillard would have been struck from the jury, for these two women were connected to their communities in at least a half-dozen ways. The trial court likely would have been left with the conclusion, as I am, that the prospective jurors were amply qualified to serve. From the record, it appears that there is only one reason the women were struck by the State: both Wendy and Sonya identified themselves as "black" on their jury questionnaires.

¶156. Jury selection can be a complicated process. Some lawyers look upon it with almost a superstitious eye, and some turn to statistics or census to gain a different perspective. There are many ways to select a jury, but we cannot and will not allow one that is tainted by racial or gender discrimination. In addition to agreeing with the majority that Ross is entitled to a new trial because of errors in the guilt and sentencing phases of his previous trial, I

79

would also reverse because the trial court utilized the wrong standard in analyzing the selection of the jury and because the State provided only a pretextual justification why the prospective jurors were struck.

**WALLER, P.J., GRAVES AND DICKINSON, JJ., JOIN THIS OPINION.**

**EASLEY, JUSTICE, DISSENTING:**

¶157. As I would affirm Ross' death penalty conviction and sentence, I am compelled to write in order to address the majority's reversal and remand to the trial court for alleged reversible error and cumulative error.

¶158. In my opinion, the majority erroneously finds reversible error. The majority finds that (1) the exclusion of Margaret Jones' statement to Wells; and (2) defense counsel's alleged failure to investigate mitigating factors during the sentencing phase of the trial amount to reversible error.

¶159. In addition, I disagree with the majority's finding of cumulative error. The majority finds that: (1) the State's use of information not in evidence during closing argument; (2) defense counsel's alleged failure to explore the tainting of the venire after Martindale's second statement; and (3) the exclusion of the ballistics report from evidence requires reversal due to cumulative error. Lastly, I address two other issues, those being, (1) Wells' proffered testimony on police investigative techniques; and (2) the weight of the evidence.

I.      **Reversible Error.**

A.      **Margaret Jones - Statement to Herbert Wells**.

¶160. The majority holds that the trial court erred by failing to follow U.R.C.C.C. Rule 9.04

concerning the portions of Jones' statements to Wells that were suitable for impeachment purposes. I disagree. The majority finds that a **Box v. State**, 437 So. 2d 19 (Miss. 1983) analysis was required. The trial court's ruling on this issue was not clear. However, Ross argued his reasoning for allowing the admission of the inconsistency as an impeachment issue, not a discovery issue.

¶161. Jones gave inconsistent statements concerning the time Ross arrived at Hale's trailer. Jones told Wells that Ross arrived at Hale's trailer between 8:30 and 9:00 p.m., and she testified at trial that Ross arrived at Hale's trailer at 11:30 p.m. However, the record reveals that Jones was questioned on direct examination about the arrival of Ross at Hale's trailer. On cross-examination, Ross failed to question Jones further on this issue.

¶162. On direct examination, Jones stated that Ross arrived at Hale's trailer in the afternoon. She stated that Ross left around 8:30 to 9:00 p.m. and returned to Hale's trailer around 11:30 p.m. to 12:00 a.m. Despite Jones' testimony that Ross came to Hale's trailer in the afternoon, left about 8:30 p.m. to 9:00 p.m., and returned around 11:30 to 12:00 a.m., Ross failed to question Jones on cross-examination about any inconsistencies in her statements to various people prior to trial. At best, Ross made a vague reference to Jones' direct testimony, stating:

Q. [Ross] was so drunk he was passed out on your couch that whole night, wasn't he?
A. After he came in, yeah.
Q. After he came in the first time or after he came in the second time.
A. The second time.
Q. All right, and that's just as true as anything else you've told us.
A. Whatever you say.

Additionally, Ross did not pursue any questions on cross-examination with regard to inconsistencies with statements made as to Ross' alleged arrival at Hale's trailer. Ross had

81

an opportunity to question Jones on cross-examination, however, he failed to do so.

Therefore, I find that this does not merit reversal.

### B.  Mitigating Factors.

### 1.  Psychological Testing.

¶163.  In *Hodges v. State*, 912 So. 2d 730, 758-59 (Miss. 2005), this Court set forth the standard of review for ineffective assistance of counsel as follows:

> Where ineffective assistance of counsel is alleged, "the benchmark [] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984).  In addition, the defendant must show that the counsel's performance was deficient and that the deficiency prejudiced the defense of the case.  *Id*. at 687, 104 S. Ct. 2052.  In order to show prejudice under the *Strickland* standard, the [defendant] must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*. at 694, 104 S. Ct. at 2068.  A defendant must make both showings under *Strickland*, otherwise, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Jones v. State*, 857 So. 2d 740, 745 (Miss. 2003) (quoting *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984)).

*Hodges*, 912 So. 2d at 758-59.  This Court also held:

> During trial counsel must make strategic discretionary decisions including whether or not to file certain motions, call certain witnesses, ask certain questions, or make certain objections.  In gauging counsel's performance, we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

*Id*. (citations omitted).

¶164.  The majority holds that there was ineffective assistance of counsel.  In this regard, the majority finds that in a post-conviction psychological examination conducted at the

Mississippi State Hospital at Whitfield, some potential mitigating factors were discovered such as physical abuse, mental abuse, alcohol abuse, and visual and auditory hallucinations. In addition, evidence presented at the competency hearing indicated that Ross was taking anti-psychotic medication and depression medication at the time of the evaluation. Furthermore, the majority finds that Ross and his mother testified about the death of Ross' ex-wife and four children in a car crash in 1984 and the murder of Ross' sister in 1982, yet defense counsel failed to show how these events psychologically affected Ross. The majority finds that the defense's failure to investigate Ross' psychological problems amounted to ineffective assistance of counsel.

¶165.   Ross also cites to numerous places at the competency hearing, which was conducted after Ross' trial and imposition of the death penalty, where his trial counsel described Ross as "stupid" and "thick headed."[9]

---

[9]   The testimony of Chris Kitchens, Ross' trial counsel, at the competency hearing reveals that Ross has taken Kitchens' statements of "stupid" and "thick headed"out of context.  Kitchens stated that  Jim Pannell, co-counsel, Ross, and he considered there to be a problem with the issue of proof.  Since they questioned the State's ability to prove the case, the best defense for Ross was to attack any proof of Ross' guilt.  They considered other alternatives; however, Ross was "adamant" that he was not guilty and not crazy.  Kitchens indicated that this was the trial strategy for Ross' case, and based on Kitchens' testimony that Ross amply participated and gave his opinion on various aspects of his case.

Kitchens did call Ross "slow" and "thick headed."  Kitchen, on cross-examination, made it clear that he thought Ross was difficult person to deal with because Ross had his own ideas about the case.  As far as Ross being stupid or thick headed, Kitchens stated:

Well, like I say the best way I can answer that question is we thought that we actually had a shot at the innocence or guilt or innocence.  Charles [Ross] was thick headed.  You might even say stupid as far as trying to tell him something, you know he would argue with you because he knew better than you did.  And I think that's going back to the argument that him and Jim Pannell had.  That was basically it.  He was telling Jim no that's not the way to do this or

In *Hodges*, this Court held:

> *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the "constitutionally protected independence of counsel" at the heart of *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052. We base our conclusion on the much more limited principle that "strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation." *Id*. at 690-691, 104 S. Ct. 2052. A decision not to investigate thus "must be directly assessed for reasonableness in all the circumstances." *Id*. at 691, 104 S. Ct. 2052.

*Hodges*, 912 So. 2d at 764.

¶166. Turning to the mitigating evidence presented during the sentencing phase of the trial, Ross' mother, Nellie Bracken, testified on his behalf. She stated that Ross' paternal grandmother watched Ross while she worked to support her children. She stated that Ross' grandmother "treated him bad." His grandmother used to lock Ross in a closet while his other siblings were playing. Bracken stated that Ross was scared of the dark closet, and his grandmother knew it. Bracken stated that she thought this treatment made Ross frightened, worried, and he would "go to pieces" when she had to leave him everyday.

¶167. Bracken also stated that Ross' father, Willie Ross, was not part of Ross' life, provided

---

whatever. And me and Jim were both pretty much ringing [sic] our hands and Jim is more out spoken than I am and they finally got into a fuss about it.

Kitchens also made it clear that Ross understood the trial process. Kitchen thought that Ross answered questions appropriately; he was competent; he had his own opinion; but Ross did not provide the best assistance to Kitchens and Pannell. Therefore, Ross' assertions are without merit.

no support for his children, and would beat Bracken and her children when he was present. Even though Bracken testified that Ross had a hard time in school and dropped out at age fourteen, he earned a G.E.D. and became a plumber while he was in prison. She also stated that Ross drank beer. When he drank beer, she stated that "it would mess up his mind." Often, Ross would do and say things while drinking that were wrong, and he later apologized for his actions.

¶168. Bracken also stated that Ross' ex-wife and three young sons were killed by a train in Arkansas more than eight years ago. The defense counsel then asked:

Q. And how did that affect him?
A. Rough.
Q. Did he have to go in the hospital or anything like that after that?
A. No. We took care of him. We talked to him and helped him through it. We helped him through it, but he will be affected with it as long as he lives.

The defense counsel also questioned Bracken about the violent death of her child and Ross' sister. Bracken stated that her daughter was shot in the back by a shotgun. She described the impact that this death had on Ross as being "awful."

¶169. When questioned about Ross' ability to know right from wrong, Bracken stated that she did not believe that Ross "has got the know how sometimes." She attributed this difficulty to "probably alcohol and the way he was treated in his lifetime." According to Bracken, alcohol was "a big part" of Ross' problems. Bracken acknowledged that Ross sometimes became violent and "ran off" family members when he was drinking. Ross later apologized for his actions. In addition, Bracken stated that she had heard that he was moved to a different prison for trying to escape, but Ross never told her why he was moved. The

prosecution alluded to a number of other instances where Ross allegedly behaved badly in prison; however, defense counsel objected to all these questions, and the trial court sustained them.

¶170.  Howard Edward Jones, a prison minister, also spoke on Ross' behalf at the sentencing hearing.  He stated that he believed Ross knew right from wrong.  Former Sheriff Leroy Meeks also testified on Ross' behalf.  He stated that he was the first law enforcement person to take Ross into custody when Ross was arrested for armed bank robbery.  While Meeks did not know if Ross threw away any shotgun shells, the shotgun that the police recovered at the time of Ross' arrest was not loaded.  In addition, Meeks stated that Ross never discharged any bullets during the robbery.

¶171.  Ross testified at the sentencing hearing about his life and background.  He confirmed his mother's testimony that his grandmother beat him and locked him in a closet.  In addition, he told the jury about the deaths of his ex-wife and his children.  He stated that he had never gotten over the deaths of these family members.  He also testified about his drinking habits.  While he did not consider himself to be an alcoholic, he stated "[m]ost people would say I am [an alcoholic].  I would say I ain't, but that's the way most alcoholics would react to that."  He also described his behavior while in prison and admitted to making alcohol in federal prison.

¶172.  Clearly, the jury heard testimony regarding Ross' physical and mental abuse as a child.  In addition, the jury heard about Ross' drinking problem that he acknowledged most people would consider to be alcoholism.  Ross and his mother testified to the effect the death of his ex-wife and young sons had on him.  Ross' mother also told the jury the effect that the

death of her daughter and Ross' sister had on him. Ross' mother stated that while Ross was had difficulty with school, he eventually earned his G.E.D. while in federal prison and learned to be a plumber. Ross' counsel adequately presented mitigating circumstances testimony. Therefore, I find this issue to be without merit.

## 2. Inmate Behavior.

¶173. Ross also argues that his counsel was ineffective for portraying him as a good prisoner in opening statements when his trial counsel "apparently" did not know about his prior prison behavior. Specifically, Ross cites to his testimony to the jury at the sentencing phase of trial about making alcohol and getting drugs in prison. Ross, however, failed to acknowledge his own unsolicited elaboration on aspects of his prison behavior. At the competency hearing, Kitchens, Ross' former trial co-counsel, testified concerning Ross' prison behavior. Kitchens stated "me and Jim [Pannell] almost fell through our seat when he said that." However, examining the record, Kitchens made clear that the statement was because he and Pannell, Ross' co-counsel, were surprised that Ross made harmful statements to the jury about himself about making alcohol in prison, not that they had no prior knowledge of Ross' behavior. The quote Ross forth in his brief was taken out of context. Kitchens actually stated:

> If I can I know one point [Ross] volunteered on the sentencing phase that he could make like homemade wine or something like that or get any drugs he wanted to in prison and, you know of course me and Jim about fell through our seat when [Ross] said that. That obviously did not help him any. I don't think in [the] sentencing hearing.

A review of Ross' testimony concerning mitigating evidence reveals that on cross-examination Ross admitted to making alcohol and then volunteered information about being able to obtain drugs and alcohol in prison. Defense counsel did not elicit this response.

87

Therefore, Ross' claim that his counsel provided ineffective assistance of counsel is taken out of context and is without merit.

## II. Cumulative Error.

### A. Prosecutor's Closing Statement.

¶174. The majority holds that the prosecutor made inappropriate references in closing arguments linking Ross' alleged presence to the scene of the crime. While the majority holds that this error may not have prejudiced Ross enough to require reversal in Issue III, the majority in Issue XII, concerning cumulative error, held that the prosecution's use of information not in evidence in his closing argument warranted reversal.

¶175. This Court has held that '[a]ttorneys are allowed wide latitude in closing arguments" and "[t]he trial judge is in the best a [sic] position to determine if an alleged objectionable remark has a prejudicial effect." *Howell*, 860 So. 2d at 751.

¶176. Ross cites to two instances in the record where he claims that the prosecution argued facts not in evidence during the closing arguments. A review of the record reveals that there was no error, and the issue is without merit. Former Sheriff Mauney testified that Ross was not at the scene of the crime. However, he explained that Ross' name was on Mauney's crime scene sign-in sheet because a number of the witnesses present at the scene stated that Ross had been in the vicinity the prior day. Mauney wrote Ross' name on the sign-in sheet as a personal note to himself so that he would not forget it.

¶177. On the first occasion of alleged prosecutorial misconduct, the record reveals that Ross objected to the prosecution's statement and the trial judge instructed the jury to disregard the prosecutor's statement, thus curing any alleged error. On the second occasion, Ross failed

88

to make a contemporaneous objection to the prosecutor's statement. In ***Rubenstein v. State***, 941 So. 2d 735, 755 (Miss. 2006), this Court held that "[t]he contemporaneous objection rule applies in death penalty cases." Therefore, this now is procedurally barred on appellate review. However not waiving the procedural bar, the prosecutor's second statement, when read in context, merely informed the jury of the first time that Ross' name came up in the investigation.

In the first instance, the prosecution stated in part:

| | |
|---|---|
| [STATE]: | There has been no dispute that Gary Mauney went out to the scene of the crime and was making notes – he was the sheriff then – as far as who was there and things like that. At that time he received information that this defendant was seen in the area that day, no dispute of that.<br>There's been no dispute – |
| [DEFENSE]: | I don't mean to interrupt, but he's arguing outside the scope of the evidence. |
| [COURT]: | Any statement or remark that doesn't have any basis in the evidence, the Court instructed the jury to disregard. You can continue, Mr. Luther. |

This Court has held that "[w]hen the trial court sustains an objection and admonishes the jury to disregard the statement, there is usually no error, 'absent unusual circumstances.'" ***Caston v. State***, 823 So. 2d 473, 494 (Miss. 2002) (citing ***Pulphus v. State***, 782 So. 2d 1220, 1223 (Miss. 2001)).

¶178. Furthermore, the trial court instructed the jury that any remarks by counsel are instructive only and not evidence. Jury instruction C-1 stated in part:

Arguments, statements, and remarks of counsel are intended to help you understand the evidence and apply the law, but are not evidence. Any argument, statement, or remark having no basis in the evidence should be disregarded by you.

89

¶179. On the second occasion, Ross failed to object to the alleged reference to facts not in evidence. When reading the statement in context, it is clear that the prosecution's statements merely address the first time that Ross' name was mentioned in the investigation, not his actual whereabouts. The prosecution stated:

> One thing [Gary Mauney] had done at the scene – no person that they were accusing like Margaret Ann Jones or anybody had told them anything about a fellow by the name of Charles Ross; but on Gary's note down at the bottom where he's at the crime scene taking a list of all the folks standing around out there looking, he writes down the name Charles Ross. That is Saturday morning after Ray Yancey was killed. That's the first thing we hear about Charles Ross.

In *Scott v. State*, 878 So. 2d 933, 953 (Miss. 2004), *overruled on other grounds*, this Court held:

> "Heightened appellate scrutiny in death penalty cases does not require abandonment of our contemporaneous objection rule which applies with equal force to death cases. For many years this Court has held that trial errors cannot be raised in this Court for the first time on appeal." *Williams v. State*, 684 So. 2d 1179, 1203 (Miss. 1996). "If no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case." *Cole v. State*, 525 So. 2d 365, 368 (Miss. 1988) (citations omitted).

*See also* **Rubenstein**, 941 So. 2d at 755 ("The contemporaneous objection rule applies in death penalty cases. Therefore, any issue to which Rubenstein failed to object is procedurally barred") (citations omitted). In addition, as addressed above, the trial court properly instructed the jury in jury instruction C-1 that any remarks by counsel "having no basis in the evidence should be disregarded" by the jury. Accordingly, I find that there was no prosecutorial misconduct.

### B.    Martindale – Tainting of the Venire.

¶180. The majority addresses two statements a potential venire person made during voir

90

dire. This potential juror, Wanda Martindale, was subsequently struck and did not sit on the jury. Martindale stated that "I've testified against [Ross] in federal court" and indicated that she would be biased by this fact. Later, Martindale also stated that "I was the victim of a crime."

¶181. The majority opinion in Issue I, Section A, finds that it has no basis to determine if Martindale's first statement that "I've testified against [Ross] in federal court" was prejudicial since there was no objection and no record on the issue. In Issue IV, Section A, concerning ineffective assistance of counsel, the majority finds no ineffective assistance of counsel. Instead, the majority finds that defense counsel should have conducted a cursory inquiry into the identity of the venire panel, and that the failure to remove Martindale before her second statement could not be considered trial strategy. Despite these findings, the majority states that the actions of Ross' trial counsel likely fell below an objective standard of reasonableness and thereby constituted error even though it cannot claim that Ross suffered prejudice. Pursuant to the majority's findings, Ross failed to meet the *Strickland* standard. *Hodges v. State*, 912 So. 2d at 758-59.

¶182. Under the *Strickland* standard, if the actions of the defense counsel do not ultimately result in prejudice, there is no ineffective assistance of counsel. *Hodges*, 912 So. 2d at 758-59. Nevertheless, the majority, in Issue XII concerning cumulative error, finds that defense counsel's failure to explore the possible tainting of the venire amounted to a reason to reverse on cumulative error.

¶183. Notwithstanding the majority's analysis, I find no error. As for Martindale's first statement, she was struck from the venire and never sat as a juror. Martindale simply stated

91

that she testified against Ross in federal court without any further explanation. Martindale also never specified whether she testified against Ross in a criminal or civil case in federal court. Therefore, the other prospective venire persons had no knowledge of Ross' federal criminal record during voir dire.

¶184. Martindale's second statement was that she was a victim of a crime and would be biased by this fact. This statement alone is not egregious and is a common question asked most venire persons in voir dire. Martindale did not state that she was a victim of a crime committed by Ross. She simply stated that she was a victim of a crime, which did not inform the rest of the venire of any potential connection between Martindale and Ross. Accordingly, I find this issue without merit.

### C. Exclusion of the Ballistics Report.

¶185. The majority finds the exclusion of the ballistics report does not merit reversal by itself. However, under a cumulative error analysis, the majority finds that the exclusion of the ballistics report and the jury's inability to have the tangible document warrants reversal of the conviction. I disagree.

¶186. Ross wanted the ballistics report to be admitted into evidence in order to refer to it in closing arguments or for impeachment. Whether the report was in evidence made no difference to Ross' ability to reference the ballistics report in his closing statement. In addition, Ross' counsel more than adequately cross-examined law enforcement and the ballistics expert concerning the report. Officer Wilbanks testified concerning the crime lab results. The police requested latent fingerprint analysis of the of the gun and provided Ross' fingerprints. Officer Wilbanks stated the report results were that "no identifications were

92

effected" meaning nothing could be positively identified. John Franovich, the crime lab ballistics expert, read the ballistics report results to the jury. The test results stated that the recovered bullets could not be positively identified as being fired from the recovered gun. In other words, Franovich stated that he could not positively say the bullets were fired from the recovered gun, nor could he exclude the possibility that the bullets were fired from another gun.

¶187. Both of Ross' defense attorneys, Kitchens and Pannell, argued closing statements before the jury. Both of the attorneys specifically referenced the failure to positively link the recovered gun to the bullets. Mr. Kitchens stated, in part:

> There were no fingerprints of Charles Ross on this gun, on these beer cans, on this TV, on that VCR. There was not a positive ballistics match on this gun.
>
> You heard Mr. Franovich, although it was sort of funny when Jim [Pannell] said, "You went to Delta State"; and he said, "No, I didn't," sort of funny; but he couldn't squirm out of the fact that he could not positively identify this gun as being the murder weapon. He couldn't do it.

Mr. Pannell, in his portion of Ross' closing argument, also referenced the fact that Ross allegedly threw the gun away, yet Ross' fingerprints were not found on the gun. In addition, Ross' counsel also stated that there was nothing to identify the bullets as coming from the gun.

¶188. Therefore, the jury was made aware of the fact that the report was inconclusive as to fingerprints and there was no match of the recovered gun to the gun used in the murder. Ross made no showing of prejudice by the exclusion of the report. Accordingly, I find this issue without merit.

### III.    Other Issues.

93

## A. Herbert Wells – Police Investigatory Techniques.

¶189. The majority finds that the trial court did not err by excluding the testimony of Herbert Wells with regard to the police investigatory techniques.[10] I agree. The majority finds that Wells' proffered testimony on police investigatory techniques failed to establish the reliability of his testimony pursuant to **Daubert** and **McClemore**. I find, in the alternative, that a review of the record reveals in this case that testimony concerning police investigative techniques was placed before the jury by other witnesses, which gives Ross' argument less credence and absolutely demonstrates that Ross was not prejudiced by the exclusion of Wells' proffered testimony.

¶190. The record reveals that Ross never attempted to admit Wells' report into evidence. Furthermore, the record reveals that all of Wells' proffered testimony, and more, was presented to the jury through other witnesses. In his proffered testimony, Wells testified generally about the police techniques. In his prior experience, Wells had been responsible for control and analysis of a number of crime scenes. Wells testified that too many non-law enforcement personnel were present at the crime scene without a lawful purpose. In addition, Wells stated that the evidence could have been either accidentally or intentionally disturbed by the large number of non-law enforcement personnel present at the scene. According to documents reviewed by Wells, Ross' fingerprints were the only prints submitted for

---

[10] The record reveals that Ross attempted to have Wells qualified as an expert in the field of criminal investigation. The State objected to Wells being qualified as an expert. The trial court never specifically qualified Wells as an expert. Instead, the trial court stated that Wells would not be allowed to testify concerning his expert opinion on investigation, police techniques, and other matters.

comparison results. However, Wells stated that there were no comparison or results for any of the latent finger prints submitted. In his experience as a law enforcement officer, Wells testified that fingerprints for each individual involved would be submitted for comparison. Further, Wells stated that he would not arrest someone based upon a tip provided by person with unknown credibility. Wells stated that prior to making an arrest, he would investigate the background of a witness who provided information to him.

¶191. The State objected to Wells' testimony and expert report based on discovery violations of U.R.C.C.C.P. Rule 4.04(a) and Rule 9.04(c)(3). The trial court excluded Wells' testimony on police techniques and stated:

> Do you intend to offer the testimony? Court had asked you to make this offer out of the presence of the jury, because Court had told you here at the bench I'm not going to let this witness testify concerning an expert opinion on the investigation, the technique, the procedure, this type thing, of this investigation; so that's all out.

The record reveals that Ross' defense counsel admirably placed the issue of problematic police techniques before the jury. Ross' counsel cross-examined a number of law enforcement personnel and presented the jury with the same concerns that were set forth in Wells' proffered testimony. Chief of Police Wilbanks, formerly Chief Deputy Wilbanks, testified that a number of people were present at the scene. The police requested the crime lab to test for latent fingerprints on the television, gun, front door of Yancey's house, and various other items in Yancey's home. Officer Wilbanks stated that the crime lab results showed that none of Ross' fingerprints were positively identified on any of these items. Officer Wilbanks also testified that no fingerprints of Donald Ross, Jr.; Jerry Sanders; Margaret Jones; and Tommy Hale were sent to the crime lab for a comparison.

¶192. Officer Wilbanks collected evidence in Yancey's home. He acknowledged that he had training to not disturb evidence as it is being collected and did not collect any items with his bare hands. Officer Wilbanks stated that he did not take a skin sample from Ross to determine if he had fired a gun within a week of his arrest. Officer Wilbanks also stated that he did not take Margaret Jones' or Tommy Hale's statement, that he did not know these witnesses, and that he did not perform a criminal record search on them.

¶193. Gary Mauney, then Police Chief of Tippah County, testified that information provided by witnesses has to be "checked out." Officer Mauney stated that the police sometimes have been given false information. Joseph Kellum, a crime lab forensic scientist, stated that he complied with standard operating procedures.

¶194. Clearly, defense counsel questioned other witnesses about police investigation techniques. The testimony of Officers Wilbanks and Mauney covered all of the issues that Wells raised in his proffered testimony. Therefore, the jury had an opportunity to hear testimony about police techniques, and there is no error.

### B. Weight of the Evidence.

¶195. The majority goes to great lengths to demonstrate inconsistences in witness testimony and circumstantial evidence. On the one hand, the majority finds the contradictory testimony of various witnesses, particularly Jones' testimony, to be untrustworthy. In addition, the majority finds the circumstantial evidence to be troubling. Nonetheless, the majority finds that the trial court did not err, and a new trial is not warranted on this basis alone.

¶196. In *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005), this Court stated the standard of review for the weight of the evidence. "[W]e will only disturb a verdict when it is so

96

contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id*. The issues of weight of the evidence and credibility of witnesses are clearly within the province of the jury. In *Stephens v. State*, this Court held:

> Jurors are permitted, and indeed have the duty to resolve the conflicts in the testimony they hear. *Gandy v. State*, 373 So. 2d 1042, 1045 (Miss. 1979). Any conflicts in the testimony of witnesses is the province of the jury. *Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1983). Who the jury believes and what conclusions it reaches are solely for its determination. As the reviewing court, we cannot and need not determine with exactitude which witness(es) or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the conflicting evidence presented a factual dispute for jury resolution. *Id*. at 300.

*Stephens v. State*, 911 So. 2d 424, 436 (Miss. 2005). In *Howell*, another death penalty case, this Court addressed the role of the jurors when confronted with conflicting witness testimony. *Howell*, 860 So. 2d at 731. This Court held:

> [T]his Court has repeatedly held that "the jury is the final arbiter of a witness's credibility." *See Williams v. State*, 794 So. 2d 1019, 1028 (Miss. 2001); *Morgan v. State*, 681 So. 2d 82, 93 (Miss. 1996). The jury alone determines the weight and worth of any conflicting testimony. *Hicks v. State*, 812 So. 2d 179, 194 (Miss. 2002).

*Howell*, 860 So. 2d at 731. Further, this Court also has held:

> This Court has in numerous cases, too many to mention, said that when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony. This wise rule applies with equal force to the state's witnesses and the appellant's witnesses, including the appellant himself. We have repeatedly held that in a criminal prosecution the jury may accept the testimony of some witnesses and reject that of others, and that they may accept in part and reject in part the evidence on behalf of the state or on behalf of the accused. In other words, the credibility of witnesses is not for the reviewing court.

*Hughes*, 735 So. 2d at 276-77 (citations omitted). This Court presumes that juries follow the instructions provided to them by the trial court, and to find otherwise would make the jury

system inoperable. *Howell*, 860 So. 2d at 733. This Court "also held that "[c]ircumstantial evidence need not exclude every 'possible doubt,' but only every other 'reasonable' hypothesis of innocence." *Neal v. State*, 805 So. 2d 520, 526 (Miss. 2002) (quoting *Tolbert v. State*, 407 So. 2d 815, 820 (Miss. 1981)).

¶197. Here, the trial court properly instructed the jury concerning the weight and credibility of the witnesses. Jury instruction C-1 stated, in pertinent part, the following:

> It is your duty to determine the facts and to determine them from the evidence produced in open court. You are to apply the law to the facts and in this way decide the case. You should not be influenced by bias, sympathy, or prejudice. Your verdict should be based on the evidence and not upon speculation, guesswork, or conjecture.
>
> You are the sole judges of the facts. Your exclusive province is to determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case. You are required and expected to use your good common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified in this case.

¶198. Ross' jury had the opportunity to hear conflicting testimony as well as the circumstantial evidence presented at trial. Pursuant to Mississippi precedent, this Court presumes that the jury followed the instructions of the court. Accordingly, I find this issue to be without merit.

## CONCLUSION

¶199. For the foregoing reasons, I respectfully dissent with the majority opinion. I would affirm the conviction and death sentence imposed on Charles Wayne Ross by the Tippah County Circuit Court jury.

**CARLSON, J., JOINS THIS OPINION.**